226 F.2d 501
 Appeal of the UNITED STATES SECURITIES AND EXCHANGE COMMISSION, and William H. Timbers, its General Counsel, from Oral and Written Orders of District Judge Arthur F. Lederle, adjudicating William H. Timbers in Contempt and Committing him to the Custody of the United States Marshal, Appellants.
 No. 12503.
 United States Court of Appeals Sixth Circuit.
 October 19, 1955.
 
 George E. Brand, Jr., and George E. Brand, Sr., Detroit, Mich., for plaintiffs, John P. Kinsey, and others.
 Samuel D. Slade, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Benjamin Forman, William H. Timbers, Alexander Cohen, Securities & Exchange Commission, Washington, D. C., Fred W. Kaess, Detroit, Mich., on the brief), for appellants.
 Richard Ford, Detroit, Mich. (Kenneth B. McConnell, Fischer, Sprague, Franklin & Ford, Detroit, Mich., on the brief), for defendant Voting Trustees.
 Before MARTIN, McALLISTER and MILLER, Circuit Judges.
 MARTIN, Circuit Judge.
 
 
 1
 In a civil action to which the United States Securities and Exchange Commission was not a party, the Commission's General Counsel, William H. Timbers [now appellant], came to Detroit with the court's approval to serve as attorney — at their request — for two Commission employees who had been threatened with punishment for contempt because of their refusal, as witnesses in the United States District Court for the Eastern District of Michigan, to divulge certain information concerning an investigation conducted by the Commission. The General Counsel brought with him the complete files of the Commission in relation to the particular investigation, but refused to introduce them in evidence or to surrender them, except conditionally as hereinafter set forth, in order to keep confidential the information and communications asserted to be privileged.
 
 
 2
 The United States District Judge compelled the General Counsel, over his protest, to be sworn as a witness and to submit for several days to rigid questioning, both by the judge and by the chief attorney for the plaintiffs in the case on trial. The Commission's counsel was by oral order of the judge committed instanter to the custody of the United States Marshal for contempt because of his refusal to obey the instructions of the judge to hand to the plaintiffs' attorney a document which the counsel claimed he was precluded from delivering by Rule 122 and Rule X-4 of the United States Securities and Exchange Commission, made pursuant to legislative authority, and by positive instructions of the Commission, no member of which was within the jurisdiction of the court. His immediate application for counsel to represent him was declined.
 
 
 3
 At the outset of his appearance in the district court and repeatedly thereafter, the General Counsel had respectfully and deferentially stated his position, assumed under direction of the Commission, and had briefed and presented the law upon which he and the Commission relied.
 
 
 4
 After the United States Marshal had taken appellant into physical custody, there was prepared by direction of the district judge an order in writing fixing the commitment of appellant to a definite period of sixty days, unless he should sooner purge himself of the adjudged contempt. Fortunately, for the protection of the personal liberty of an advocate in the respectful assertion of what he considered to be his lawful rights, the Chief Judge of this circuit was accessible and, upon application of appellant who came to his chambers in the custody of the marshal, entered an order staying the effectiveness of the oral and written contempt orders of the United States District Judge until such time as an appeal from his orders should be determined finally.
 
 
 5
 The cause in which the appellant general counsel was found guilty of contempt [Kinsey, et al. v. Knapp, et al.] was a stockholders' derivative and personal action brought in the United States District Court against the corporate officers and directors of Monroe Paper Products Company for alleged misuse of their fiduciary positions and of the corporate funds and facilities in a continuing conspiracy, which alleged the issuance and delivery of voting trust certificates in violation of the Federal Securities Act and of the Michigan Blue Sky Law, Comp.Laws 1948 Mich. § 451.1 et seq., and charged that the voting trust certificates were not lawfully registered with the Securities and Exchange Commission in compliance with the Securities Act of 1933, 15 U.S.C.A. § 77a et seq.
 
 
 6
 On or about February 1, 1954, Edward H. Rakow, who was in charge of the Commission's Detroit office, received from the attorney for plaintiffs a copy of the complaint filed in Kinsey, et al. v. Knapp, et al., following which, the Commission began an investigation and, through its representatives, interviewed and obtained confidential statements from numerous people, including the voting trustees and their attorneys, from whom the Commission's representatives received reasons for their failure to register the certificates in conformity with the Securities Act. The voting trustees held a conference with the Commission in Washington.
 
 
 7
 A subpoena was served on Rakow at his office in Detroit about two and one-half months after the trial in the district court had commenced. The issuance of this subpoena was instigated by the trial judge, who thus addressed the attorney for plaintiffs: "* * * why not subpoena Mr. Rakow who had charge of it here and find out what happened, then you have an additional evidence of the violation of their fiduciary duties in that they are spending their time when they ought to be working at the plant, trying to sustain their position when they know they are legally wrong." The judge said further: "It seems to me you are too cautious about a lot of things here." The attorney acquiesced and the subpoena was issued the following day.
 
 
 8
 A week later, Thomas G. Meeker, Assistant General Counsel for the Securities and Exchange Commission, appeared in court and stated that he had come with the understanding that he, the attorneys in the case, and the judge were to discuss the question of the Rakow subpoena in the hope that some of the problems involved might be ironed out. The agency counsel asserted that he desired to cooperate with and aid the court in every way possible; and that it not being clear from the transcript in what connection the judge considered the public interest to be involved, he desired to ascertain that and to report back to the Commission. The judge said: "I presently don't know of any public interest that would require your appearance." Considerable colloquy followed, during which the judge remarked: "If the records are useful to the plaintiff, they want them, unless you can show me that I have no authority to order them produced, they will be produced. The problem is up to Mr. Brand [attorney for plaintiffs]; it is not my problem."
 
 
 9
 Counsel Meeker again assured the court that he had come in an effort to do what the Commission instructed him to do, namely to cooperate with the court but that, at the same time, he desired to point out that service upon the agent is not valid service upon the Commission inasmuch as the agent is not the legal custodian of the agency records; that the only valid service which could be made upon the Commission in the instant case would necessarily be in the District of Columbia. He added that the agency desired to make available to the court all records not considered by it to be confidential, and that the Commission has discretion to decide what confidential material obtained by it is in the public interest to be disclosed. He said that he desired, "in order to avoid a head-on clash," to ascertain exactly what "the context of the court's request" was in asking Mr. Brand to issue the subpoena; and that it appeared that the material demanded by the subpoena went far beyond what the court suggested might be obtained from the Commission.
 
 
 10
 Further colloquy ensued, during which the judge stated his major premise to be that the business of any governmental agency is public business; and that, in a derivative action, stockholders should have access to all the information which the Securities and Exchange Commission has concerning the subject matter. He called attention to the fact that the Commission had performed very fine public service in his community; but he adhered to his position that the Commission should be willing to disclose everything in its possession concerning the instant case. He stated: "Now, of course that is entirely up to Mr. Brand; if he wants to settle for less than that, that is his problem. * * * I have no hesitancy in saying, and you may repeat it to the Commission, that in my opinion the Commission should disclose to both parties all of the information that it has in its files relating to this case." The judge declared that he wanted it definitely understood that he would have no part in concealing any public record. When the Commission counsel stated that the Commission was attempting to cooperate with the court, the judge interrupted to say: "All right, let's see the documents then." The counsel responded that the documents were not in his, but in the Commission's, custody; but that he would transmit the judge's request to the Commission. The judge replied that it was not a request and that he did not want anything done as a favor to him. The counsel stood upon his proposition that the particular records were "private records developed in the course of an investigation which is still continuing." He added that he would report to the Commission as the court had directed him to do.
 
 
 11
 The judge reiterated that he did not want to be a party to any proceeding concealing public records, and that it must not be said that any agreement entered into was reached at his request. Attorney Meeker stated that neither did the Commission desire to conceal public records and that he assumed the question to be when certain records become public and when they remain private. The court agreed, and added that a question of law was presented, to which the agency attorney assented. The colloquy ended with the court's saying, "I will be bound by the same law you are."
 
 
 12
 During next day's session, the judge asked the attorney for plaintiffs if he had gotten all the documents he wanted from the SEC. Attorney Brand answered that he had "not yet" but hoped to soon. He entered upon a clear exposition of the existing situation, during which he stated that he expected to go through with the Rakow subpoena unless he got "what we think we need." He said that some progress had been made, in that counsel Meeker had told him that certain things might be exhibited to him without violating the policy of the Commission's rule; and that, to accomplish this, he had drawn up a stipulation of important facts which he outlined. He said further that his investigation disclosed that Rakow knew nothing about certain important conferences outside Detroit and, therefore, could not present needed information; moreover, that counsel Meeker had indicated that the files of the Securities and Exchange Commission were not in Rakow's possession and that his examination "would not disclose a great part of what we want to show."
 
 
 13
 Attorney Brand added: "The result is that if we need that information, your Honor cannot help us here by the process of this court; we will have to go to Washington, to take necessary steps to comply with deposition procedure and rules, and eventually we will be met with some statement of the position of the SEC, and that will have to be tried out before another judge, and if he should order the files produced, it is not only conceivable, but I rather think the SEC would be inclined to try to review it in the Supreme Court of the United States; and if they did not, we would not have the information unless we were successful in upsetting the order of the Judge." He asserted that, while he concurred in what the judge had said in reference to not becoming a party to the suppression of any files, if he could get the defendants to agree to the occurrences outlined he would, as a practical matter, best serve the interest of his clients by proceeding to an agreement; but that, if the judge should feel that the disclosure of the files should be made to him, attorneys for plaintiffs would have to defer to his judgment in the matter. He said further that he was of opinion that the Commission should produce its file in the judge's chambers in the presence of all counsel, with the opportunity afforded them to examine the files, and that he was willing to "settle for that. That is my assumption of responsibility."
 
 
 14
 The trial judge did not concur in the attorney's suggestion. To the contrary, he stated that a situation was presented "where it appears that the court is being handicapped because an agency of the executive department places itself in a position more impregnable than an opposing lawyer is"; that "the profession owes a duty to the administration of justice to attempt to make it possible for lawyers to get information from executive agencies without using a can opener"; and that he saw no reason why all the files of the SEC relating to the case should not be opened to the attorneys. The judge stated that as far as he was concerned, he was perfectly willing to do everything that he could to see that the executive department does not handicap the courts.
 
 
 15
 At a later session, the judge complained from the bench that Rakow had not been called as a witness, with the result that no opportunity had been given the court to rule upon the question of whether the Commission should be required to make the submission of its complete files upon which he continued to insist. He stated that there was some private negotiation going on "to determine just how much you are going to disclose to the judge."
 
 
 16
 Attorney Brand assured the court that no deal was being made by him with the Securities and Exchange Commission; that he was obtaining information as the result of the issuance of the Rakow subpoena and was expecting additional information, which, if ruled by the court to be admissible, would get into the record all that, in his opinion, was needed; and that thereby "the power of the court to pierce the veil has been sustained."
 
 
 17
 At a court session several days later, Rakow asked permission to make a brief statement concerning appearance of two expected witnesses from the staff of the Securities and Exchange Commission. He described the circumstances relating to communications between him and the attorneys and between him and the Washington office of the Commission. The court admonished him not to use the expression "cooperate with the court," that the court would get its information from the Commission "not as a matter of grace but as a matter of right"; that the record must be perfectly clear that the court has not approved or condoned any action or inaction on the part of the Commission; and that it must be perfectly clear that the court is not requesting the Commission to do anything. He concluded: "You just stand up for your rights."
 
 
 18
 Next day, Walter G. Holden, Assistant Director of the Division of Trading and Exchanges of the SEC, who incidentally was a lawyer, took the stand. Shortly after he had done so, the judge asked him what authority he had for refusing to answer any question propounded to him by the attorneys. He replied that he was personally bound by the direction of the Commission and was authorized to testify as to conversations, conferences and communications with the defendants and their attorneys. The judge asked where the Commission got its authority to determine what evidence should be produced in court. The witness replied that he did not believe such a situation to be presented; that the Commission's investigation files were confidential; and that its employees were prohibited from revealing information from such files without specific authorization from the Commission. The judge continued to interrogate: "Where did the Commission get the authority to adopt a rule limiting the inquiry that can be made in a court?" The witness responded that he was not in position to discuss the legal background or reason for the Commission's rule.
 
 
 19
 The court then addressed the attorney for plaintiff, saying that unless he were shown some authority justifying the refusal of the witness to answer any questions which the attorney desired to ask the court would be compelled to rule that "a Commission regulation cannot restrict the scope of inquiry in the courts." Attorney Brand requested permission to proceed to obtain the information which the witness, under instructions of the Commission, felt free to divulge, stating that he was "interested in getting something." The judge commented: "Again, I don't want to dictate to you how you should try your lawsuit, but I do want to assert the rights of the courts to require a witness to testify, and I am not over-awed by the fact that some superior officer to this witness has told him that he did not have to testify in court."
 
 
 20
 The witness asked if he could make a statement; and the attorney answered affirmatively. The witness interrogated: "Up to this time, have I answered your questions?" Attorney Brand replied, "you have so far." However, he stated that he had not gotten into an area in which the witness felt inhibited, but that he was going to have to get into that area. Witness Holden testified at some length until he was asked by the attorney for plaintiffs to state the substance of the minutes of a Commission meeting. He said that he felt unauthorized to disclose the contents of the minutes of the Commission's meetings. Asked by the judge whether the minutes of the SEC are public records, the witness replied that they are not. When the attorney asked him if he would request authority of the Commission to produce a copy of the minutes, the witness stated that he would be glad to do so. He evinced a cooperative spirit in furnishing all information requested, except that which was forbidden by the Commission's directives. Obviously, in view of the judge's attitude, he was in a difficult position. He explained that he had appeared voluntarily, with the authorization of the Securities and Exchange Commission; that he had come for the sole purpose of testifying concerning communications and conferences with the voting trustees and their attorneys; and that he had been directed by the Commission to testify as to such matters. He then added: "As to other matters pertaining to the internal operations of the Commission, staff conferences, matters of that kind, I am to rely upon the privilege provided by Rule 122 under the Securities Act of 1933 and Rule X-4 under the Securities Act of 1934 [15 U.S.C.A. § 78a et seq.]. I must therefore respectfully decline to answer the question without an opportunity to present the matter to the Commission for their consideration."
 
 
 21
 Shortly after this statement was made, the judge said: "If Congress has limited the authority of the Commission to disclose information which it acquires, I am presently of the view that the court has no authority to require that that information be divulged. * * * unless there is some provision that the meetings of the Commission shall be public, it may be that the Commission has a perfect right to conduct secret meetings." He asked: "Can you have a secret meeting attended by various people?" He expressed serious doubt about the advisability of any public agency conducting secret meetings and refusing to disclose what happens at such meetings; but stated that, if the public should prefer public meetings, the remedy rested with Congress and not with the courts. He considered the matter of great public interest and importance, going beyond the present lawsuit, and he had accordingly had the reporters prepare hourly copies of the transcript so that the matter could be straightened out. The attorney for plaintiffs urged that the minutes of the Commission meeting are not privileged and complained about the lack of information obtained from the Commission. The judge then stated: "Well, maybe I can sum up what you say: That as an American citizen, you think you have the right to know what your agents are doing, but you haven't been able to convince the agents that they should tell you what they have been doing, as an American citizen. You got some information, now, as a lawyer and officer of the court, you are in a position where you are no longer a suppliant. You are in a position where you are ready to make demands." He went on to say that he wanted "these gentlemen representing the Commission to be protected so that they are not guilty of some offense for disclosing secrets that they are under obligation to keep secret." He told Holden that he assumed that the witness would stick to his position, which would make an issue; but said: "You may rest assured that I am not going to keep you in Detroit on this trip."
 
 
 22
 However, at the afternoon session of the same day, the judge declared that he had "no intention of restraining the liberty of the witness tonight," but that the witnesses must not "leave town" although they need not "stay in any particular place." The judge told Holden that he was in jeopardy and stated that the United States Attorney would surely be glad to represent him, but that if Holden wanted to get an attorney of his own choosing, he would be given time to do it; that the judge did not want anybody "to get into trouble without having a lawyer there to protect him." Both the judge and the plaintiffs' attorney continued to question the witness, who claimed his privilege not to answer numerous questions. The court inquired whether any communications in the Commission's files, in relation to this case, indicated a violation of criminal law, and whether the staff had made a recommendation to the Commission on or before August 4 that the civil proceedings should be begun.
 
 
 23
 When Edward H. Rakow was put upon the witness stand, he stated that he had been a lawyer since 1926; and, from March, 1946, had been attorney in charge of the Detroit office, a branch of the Chicago Regional Office of the Securities and Exchange Commission. He stated his function to embrace giving interpretative and preliminary, but not final, opinions concerning the application of the laws administered by the Commission; and that this work involved conferences with attorneys, dealers in securities, and members of the public. When information or complaints tending to show violation of the Act came to him, he would report promptly such facts to the regional administrator who would initiate an informal investigation and thereafter Rakow would perform such investigative work as the administrator assigned to him.
 
 
 24
 Rakow responded to numerous questions asked both by attorney Brand and by the judge; but, as was inevitable, the question of privilege was raised and the witness respectfully declined to reveal matters which he considered violative of the Commission's rules and instructions. The judge brought up the issue of whether an injunction might have terminated illegal activity and told Rakow to answer as amicus curiae instead of as witness — a difficult position in which to place a witness. Rakow attempted to elucidate the matter, but the court admonished him: "Never mind arguing." The judge complained that a large part of his difficulty developed from the fact that information could not be obtained from the SEC, but expressed confidence that "ultimately the court is going to find out all about these transactions, regardless of how many obstructions may be placed in the way." He told Rakow to report to the Commission that a grand jury could be called at any moment.
 
 
 25
 At the opening of the next day's session, the judge said: "I thought yesterday that the three SEC witnesses were quite nervous. Perhaps they had reason to be. They were in a difficult situation. They had to choose between two courses of action. They could obey the court and disobey the Commission, which might result in their losing their jobs permanently, or they could obey the Commission and disobey the court and thus lose their freedom temporarily. I don't know which course would be the wiser for them to follow. It may be that a temporary loss of freedom would be less of a loss than a permanent loss of a civil service job."
 
 
 26
 Rakow was recalled to the witness stand, but had not gone far in his testimony when the judge told the attorney for plaintiffs that he had another idea. This idea was to carry out the suggestion of the attorney to take the depositions of the Securities and Exchange Commissioners in Washington. An attorney for the defendants objected on the ground that the records in Washington were immaterial, and asked attorney Brand to state what he expected to prove. Before the attorney for plaintiffs could answer, the judge spoke. He directed attention to the subpoena for Rakow, which he thought demanded everything the Commission and Rakow had "except the desk." He pointed out that Rakow had brought in only twenty per cent of the file; and said that his whole objective was to get the worry off the subordinates and to place it where it belonged — on the head of the department.
 
 
 27
 Attorney Brand asserted his desire to complete the examination of a witness (Sempliner) before going to Washington. A discussion as to tentative adjournment ensued. Rakow asked whether he should be available on the following Thursday, to which the court replied: "No. * * * The newspapers notwithstanding you are going to be at liberty for sometime to come."
 
 
 28
 When the case was taken up a few days later, the judge offered — should any of the attorneys desire it — to write to the Commissioners and "ask them to submit what they think the facts are in this case." Defendants' attorney stated deferentially that it would seem unfair "for the court to invite any stranger to submit a statement of facts" but that he did not object to the submission of a brief on the law. The judge stated that he was not interested in an academic brief from the Securities and Exchange Commission. Attorney Brand declared that he was prepared to proceed with taking, in Washington, the depositions of the members of the Commission, its secretary, and Rakow and Holden; but that he had made a request for information which he thought would eliminate "almost entirely, if not entirely," necessity for taking the depositions.
 
 
 29
 The judge criticized the Commission for taking no action against "what the newspapers refer to as self-confessed criminals." He said that he had a suspicion that the Commission was making a "token offer," so that it would appear that it was cooperating with the court when, as a matter of fact, it was "covering up" much more information than it was disclosing. Referring to Rakow and Holden, he said: "Don't get me started. Frankly, if those two lawyers had been in private practice instead of under the thumb of a boss, neither one of them would have gone home that night. So that is that but it suddenly occurred to me — don't write this down —" [whereupon, the record shows, the judge made a statement off the record]. Following this, he said: "If the Commission takes the position that they have a right to tell the lawyers working for them that those lawyers, as officers of this court, don't have to cooperate with the court, why, may be we need some legislation."
 
 
 30
 A few days later, the judge addressed Rakow, stating that what he had to say was not in the nature of a threat, but that he had felt some concern about the ultimate outcome of the matter and considered it fair to tell the witness how the picture looked to him at the time. Several minutes later, however, he told Rakow that he thought the only proper course for the court to take — if it were decided that Rakow was in contempt — would be to have him committed immediately with the option to purge himself if he should decide that he was wrong and wanted to come back and answer the question. Rakow responded: "In that event, your Honor, I would appreciate very much the opportunity of having counsel present." The judge said that the reason he had stopped the examination of Rakow was to give him the opportunity to consult counsel. The presence of Holden was also desired, so a week's adjournment was taken; and it was understood that General Counsel Timbers of the Securities and Exchange Commission would be notified.
 
 
 31
 When the court reassembled, the judge stated that he had tried to frame the following telegram to General Counsel Timbers: "Will you please have available in court February 10 all documents and written memorandum in possession of the Commission or any of its employees relating to Monroe Paper Products Company case?" Attorney Brand suggested the inclusion in the telegram of "documents and correspondence"; whereupon he and the court entered into a colloquy, resulting in a request for the inclusion of all minutes, inter-office communications and correspondence with anybody, including stockholders. Defendants' attorney inquired whether the telegram was being sent on the court's own motion or at the request of plaintiffs, saying that he considered it a most extraordinary step for a trial judge to apply by telegram to a stranger to bring papers into court. The judge explained that, as far as he was concerned, the parties to the suit were going to have all the information that had anything to do with the case. The attorney for defendants stated that he had not understood that the general counsel was coming to Detroit to furnish more evidence but had thought he would "be on hand to sue out a writ of habeas corpus when Mr. Rakow goes to jail."
 
 
 32
 When General Counsel Timbers appeared at the court session in Detroit a week later, Judge Lederle stated to him that the public interest would be served better by disclosure of all information in possession of the Commission relative to the case on trial and asked him if he had the material in court which the judge's telegram requested. The general counsel responded that he had; but requested the court to rule on the motion to quash the Rakow subpoena and took exception to the court's declining to do so. He also noted exception to the statement of the judge relative to the duties of the Commission concerning the investigation of possible criminal violations of federal statutes.
 
 
 33
 Attorney Timbers asserted that "one of the reasons we feel it is in the public interest to protect the privileged character of our file is that there have been investigations of possible criminal violations of our statutes, and this Commission still considers that investigation open"; and that the primary duty of enforcing the criminal provisions, as well as the other provisions of the Securities laws, was imposed by Congress upon the Securities and Exchange Commission. Turning to the telegram sent him by the judge, he said that in producing the Commission's records in conformity with the judge's request he had done so in deference to the court, but was maintaining the claimed privilege asserted by the Commission on the same grounds; and that, in bringing the files to Detroit, he had no intention to relax the assertion of the claim of privilege theretofore made. The counsel said further that, as attorney for the Commission, he was under the same restraint as were the other employees of the Commission with respect to disclosing any of the privileged portions of the Commission's files, that he also was operating under Rule 122 of the 1933 Act, Rule X-4 of the 1934 Act, and specifically under the direction of the Commission; and that he assumed that whatever aid he could render the court would be in respect of legal problems, his appearance in Detroit not changing the factual situation concerning the Commission's claim of privilege.
 
 
 34
 The judge responded: "That may be true. That is really the very issue that we have involved here. I think what I meant by the last statement that I made, don't get the idea that so far as the question of the production of these documents and the testimony of the witnesses from the Commission that you and I are on the same side of the lawsuit. You just keep right on insisting on protecting the Commission and I will expect whatever help I need on my side of the matter here I am going to get from Mr. Boos [amicus curiae]. So presently you will be performing the duties, I think, your duties, best and will be most helpful to me if you just keep right on insisting on your rights."
 
 
 35
 The general counsel pointed out the distinction between cases in which the government is a party to the suit and those where it is not, as in the instant case. He disclaimed any contemptuous attitude toward the court, stating his information to be that "the headlines have said" that the court had been defied by the Commission and its representatives. When, at the request of the attorney for plaintiffs, the appearance of attorneys was being noted for the record, the General Counsel of the Securities and Exchange Commission stated that he appeared simply as attorney for the SEC witnesses who had been requested to appear; but that he, of course, was representing the Commission, also.
 
 
 36
 Rakow was again called to the witness stand and was examined concerning his practices in the course of his work. During the course of this examination, the judge admonished the witness to try "to answer Mr. Brand's questions, and leave those speeches to Mr. Timbers." The Commission's General Counsel respectfully excepted to the court's statement. The court instructed Rakow to answer questions "yes" or "no" if he could, and added: "What I said earlier about a government lawyer being just another lawyer in the courtroom applies, a government witness is just another witness."
 
 
 37
 The examination of Rakow as a witness continued at length. He furnished much pertinent information solicited by the attorney for plaintiffs. When asked what he did as enforcement attorney for the Commission to determine whether a statement of a certain person was true or false, he declined to answer on the basis of his reliance on Rule 122 and Rule X-4 and on his directives from the Commission. The judge asserted that his refusal to answer the question had no legal basis and that the witness would have to answer. Upon request of an attorney for the defendants, the directive to witness Rakow was produced. The document had been signed by the Secretary of the Securities and Exchange Commission and authorized the witness to testify concerning correspondence, conferences and conversations had with the defendants to the lawsuit and their attorneys, and to produce copies of such correspondence or memoranda; but instructed Rakow not to testify with respect to information obtained in the Commission's investigation of the Monroe Paper Products Company or to matter from persons other than defendants and their attorneys or agents, or with respect to internal intra-agency conversations, conferences, communications, memoranda, reports, recommendations, minutes and determinations relating to the investigation and the action, if any, to be taken as a result of the investigation. He was directed to invite the court's attention — in addition to the Commission's Rule 122 under the Act of 1933 and Rule X-4 under the Act of 1934 — to the instructions given him and to furnish the court with a copy of the instructions.
 
 
 38
 The Commission's attorney filed on its behalf a written claim of privilege which corresponded with the privilege claimed in the Commission's instructions to Rakow, already introduced in evidence. However, the writing contained the following additional matter: "Said privilege is claimed in the public interest to prevent injury to the Commission's investigative and internal administrative processes. It does not appear that there is any countervailing public interest here sufficient to warrant waiver by the Commission of the privilege afforded it by law. A comprehensive brief in support of this claim of privilege has heretofore been filed with this court."
 
 
 39
 Rakow continued his testimony, during which he was interrupted by debates between counsel and colloquy between the court and counsel. Finally, he was asked concerning his recollection as to what he had stated in an intra-departmental report rendered by him on February 10. He declined to answer under his claimed privilege. Attorney Brand then asked the Commission's General Counsel whether he would produce the report, to which the response was that the demand was improperly made upon him, that he did not have custody of the documents and that he had no power to waive the privilege. He stated that his sole concern was to furnish whatever guidance he could as an officer of the court, as well as general counsel to the Commission, to help the court resolve the question of law raised. He declined to produce the file or any portion of it.
 
 
 40
 The judge asked counsel Timbers why he should not produce all records which he had brought with him. The reply was a reiteration of the claimed privilege, accompanied by a proffer that the entire files of the Commission be deposited under seal with the Clerk of the United States District Court for the sole purpose of being transmitted to the United States Court of Appeals, Sixth Circuit, in connection with any proceedings which might arise out of the present proceeding in which the judge had expressed to representatives of the Commission his intention to hold them in contempt of court, if the court felt disposed to do so. The judge stated that the suggestion was excellent; but soon it developed that there was a sharp difference between the court's interpretation of the proffer and that of the counsel who made it. The judge stated that the documents were in possession of the clerk, as agent of the court, and so were now in his possession. He asked attorney Brand what part of the records he wanted "right now" and received the answer that the report of Rakow dated February 10 was desired. The court said: "Well, who has it? Will you bring it up, Mr. Timbers?" The latter answered: "Well, now, your Honor, I am very sorry, but I don't believe that this ___." The judge interrupted, saying: "Swear Mr. Timbers, then. He really is the man who has possession of these documents."
 
 
 41
 The Commission's attorney thus addressed the court: "Your Honor, may I say, first, that what your Honor has just suggested, swearing of me as a lawyer for this Commission, is grossly unfair and in my humble opinion highly improper. You have requested me to come here as the chief counsel, chief legal officer of this Commission, to represent the Commission. * * * And by swearing me as a witness, you deprive the Commission of its attorney in court." The judge responded: "You don't have to make a long speech. You don't want to be sworn. Period." Counsel Timbers reiterated that it would be most unfair to swear him, and the judge then asked: "Well, will you turn the physical possession of these papers over to one of your assistants?" Attorney Timbers replied that the matter was entirely within his discretion. The court said: "Well, let's get it this way, then. You have made a token offer of these papers by bringing them here, but after you get them here, you tell me I can't look at them. Is that what you mean?"
 
 
 42
 The general counsel again made explicit the basis of his tender, which he had already stated clearly. The court renewed insistence upon a "yes" or "no" answer. When the attorney continued to try to explain his position, the judge interrupted: "I didn't ask for a speech. * * * Will you give me those papers or won't you?" The lawyer asked: "For what purpose, your Honor?" The judge replied: "Any purpose I want to use it for"; to which the Commission's counsel rejoined: "Well, on that basis, of course, my answer is very respectfully, no, I cannot do so."
 
 
 43
 The general counsel announced his position: "If you will let me proceed in my own way, I will do my best to help your Honor resolve this problem. That file was sent to Washington, as your Honor knows, on or about the date indicated, because you indicated to Mr. Rakow that he should be in Washington and should make that file available there to Mr. Brand, who then expressed his intention of taking the depositions, at your Honor's suggestion, of the members of the United States Securities and Exchange Commission in Washington.
 
 
 44
 "To facilitate that, Mr. Rakow brought the file there, turned it over to the Commission, and was prepared to submit himself there to depositions, pursuant to your Honor's suggestion. Mr. Brand, for reasons which we shall discuss later, abandoned that idea despite my telegram to him indicating the Commission was waiting for him, and that we would be prepared to test in the courts of law in the District of Columbia the legal questions that the pendency of those depositions raised, as your Honor had suggested that procedure to him, and which we thought was proper.
 
 
 45
 "That file remained there until Mr. Brand changed his mind and decided to proceed again in Detroit. Your Honor then suggested to Mr. Rakow that he return to the witness stand with Mr. Holden and be prepared to answer the questions theretofore propounded to him and with respect to which he claimed his privilege. That file which your Honor has now asked me to turn over to Mr. Rakow, in the meantime remained in the possession of the Commission. When I received your Honor's telegram requesting that the entire file be brought here, I responded not as a witness, not under subpoena, with no intention whatsoever of bringing it here to relax the privilege which had been validly exercised by the Commission with respect to that file, but for the purpose simply of courtesy, deference to your Honor to have the file here." He added that he considered the legitimate purpose of having the file in the courtroom as indicated was to make it available to the Court of Appeals for the Sixth Circuit, and that the record would clearly indicate the limited nature of the purpose of the tender and that the court had asked him to submit an order "to carry it out." The judge commented that the purpose of the attorney's offer was not to disclose evidence to the court, but to conceal evidence; and that he had misunderstood the counsel's tender.
 
 
 46
 At the next day's session, the judge announced that the motion to quash the Rakow subpoena, which had been pending for some time, was overruled; to which action the Commission's counsel noted exception. Counsel Timbers proceeded to argue to the court — or, more accurately expressed, with the court — as to the "extraordinary course of procedure" in the requirement that he should take the witness stand. He also argued further in support of the Commission's position in the matter of privilege, and emphasized the effort of the Commission to cooperate with the court to the extent that it could consistently do so, pointing out again, however, that the suit was a private one to which the SEC was not a party; that, at the direction of the Commission, the files are still open and might at some future date be turned over to the Department of Justice in connection with any possible criminal proceeding. He denied that the Commission was concealing anything. Thereupon, the judge asked him whether he was willing to submit all the files which he had with him and let the court decide whether or not he was concealing evidence. He replied that he would like to make a definite tender. After considerable discussion of various matters, the tender was made by the Commission's counsel that, with respect to its investigation file as to affidavits, exhibits and other documents obtained by its representatives in the course of their investigation of alleged violations of the statute [except correspondence and communications between the Commission's staff and the defendant voting trustees, their attorneys, etc.], and all intra-agency memoranda, documents, communications among members of the Commission and its staff, the claim of privilege would remain firm; but that the court would be delivered the documents and material claimed to be privileged upon the distinct understanding that, should the court disagree with the Commission and find that any particular document was not within the claimed privilege, the judge would not disclose such document to anyone, including attorneys in the case, until the appellate court could rule upon the matter. Counsel Timbers, upon request of the court, agreed to submit the proposed tender in writing, which he did at the afternoon session. The proffer, upon the terms made, was rejected as unsatisfactory both by attorney Brand and by the judge.
 
 
 47
 The judge declared that the tragic consequences of the refusal of the Commission to cooperate in releasing its records had been very expensive to the litigants and to the public. He addressed the United States Attorney, who was in the courtroom, saying that it seemed that the prosecuting officer would be "the person who is most interested in concealing evidence that is now in the Commission's files"; and asked him whether he had any objection to releasing to the court all records brought by Mr. Timbers from the Commission. The government attorney expressed surprise at being asked the question, inasmuch as he considered that he should take no part in the private litigation and that, to instigate a criminal investigation during the pendency of the private litigation would have a tendency toward intimidation of witnesses.
 
 
 48
 When, after a prolonged recess, counsel Timbers returned to the proceedings in the United States District Court at Detroit, Rakow, who, as the judge stated, was then in possession of the SEC files, was again put upon the stand. He declined to produce his reports on the conference of February 8, 1954, basing his refusal upon the rules of the Commission already cited and upon his directives from the Commission. Thereupon, attorney Brand stated: "At this point, your Honor, I am going to have to call Mr. Timbers as a witness." The Commission's counsel asserted his objections to being called to the witness stand, upon the same ground which he had fully stated when the judge previously made the suggestion that he should be called as a witness. The court overruled his objection and directed that he be sworn. The agency attorney asked for an adjournment so that he might obtain counsel and seek advice on this testimony. The judge denied his request for adjournment; and the lawyer noted exception to the court's summary action. He was ordered to be seated; "step around and be sworn."
 
 
 49
 Attorney Timbers asked the court's indulgence before submitting to the court's directive to him to take the witness stand, to tender the document identified by Rakow as his report of investigation subject to the formal tender which had been made previously. The court proclaimed: "The ruling that you take the witness stand will stand." The attorney asked: "I take it that our tender is declined?" The judge replied: "I did not say anything about your tender." Attorney Brand then proceeded to a detailed examination of the witness. Sustained by the court, the attorney for plaintiffs demanded a "yes" or "no" answer, over the protest of general counsel Timbers, as to whether or not he would produce the Rakow document. The witness answered, "no." Attorney Brand asserted that he wished to proceed with a number of other questions. This is important, in view of the fact that he now argues that the adjudication of contempt related only to the February report of Rakow.
 
 
 50
 The Commission's counsel continued to urge his privilege, and pointed out the handicap under which an attorney labors when he is forced to be a witness. He requested that the record show — which it did — that during the argument on the question of law as to the validity of the Commission's position he was on the witness stand and thereby deprived of the opportunity to present an argument. The court permitted him to argue the point. When the counsel-witness was recalled to the witness stand, he was admonished that he would be held in contempt for refusing to produce the document demanded, but that this would not end his examination.
 
 
 51
 The examining attorney again demanded the document; whereupon, counsel Timbers replied that he understood that he had been held in contempt. The judge said: "No. All I told you was that, as I understand the law at this time, I think you are in contempt, but you are not in contempt at this moment." Attorney Timbers renewed his request for counsel of his own choosing, in view of the judge's announced intention to hold him in contempt which had put his liberty in jeopardy without the benefit of counsel. The judge responded that he did not want the contempt proceedings to interfere with the trial of the case any more than was necessary, and that the court's present position was that the attorney was not in contempt. He assured the witness that, before ultimate decision was reached as to what "was going to happen" to him, he would be given full opportunity to be heard.
 
 
 52
 Attorney Brand continued to prod the witness to produce the file of the Commission for the purpose of having it marked as an exhibit. The witness stood upon his tender. Through requirement of the court, counsel Timbers had to alternate from time to time from his role of witness to that of attorney, and vice versa. The judge repeated that the witness was in contempt of court for refusal to answer other questions put to him; and said, among other things, that, "if justice requires, I will take care of the contempt matter very promptly." The witness-counsel was subjected to prolonged grilling by the attorney for plaintiffs and by the judge, who stated at one time: "I don't ordinarily argue with a witness, and you are a witness now."
 
 
 53
 When the general counsel declined to produce a certain report or to testify concerning its contents, except upon its submission to the court to determine whether the document in whole or in part was covered by the Commission's claim of privilege as specifically set forth in its tender, the judge said that he thought the counsel-witness was again in contempt of court and that he would make that statement "with reference to all of the other questions that you were asked this afternoon." Thereupon, attorney Timbers became outspoken: "In view of the Court's statement, and in view of your Honor's invitation to me a few minutes ago to object as a witness when I felt necessary to do so, I respectfully except to your Honor's statement that in your opinion I am in contempt of court. I respectfully object to the procedure by which I am placed in the position of being, or even suggested as being in contempt of court, without the advice of counsel, without an opportunity fully to argue the matter before your Honor; and I further specifically object to what I regard as highly irregular, and may I say with the utmost respect, reprehensible procedure by which an officer of the Government, who is trying to do nothing but his job to the best of his ability, and to perform the oath of office which he has taken, the same as the court has taken, to place him in the position that he is today, and dangling as a Damocles sword a threat of contempt of court without an opportunity to be heard, to be defended, or to obtain a prompt review by a proper court of such action. I strenuously object to it as improper, irregular and unAmerican." Asked by the court what he meant by the expression "a proper court," the lawyer stated that he meant an appropriate court of review.
 
 
 54
 At the next morning's session, attorney Timbers retracted his use of the words "reprehensible" and "unAmerican." He stated that, in his humble opinion, the inquisition by the court into the propriety of the procedure of the Securities and Exchange Commission represented a grave intrusion by the judicial branch of the government upon the executive branch. He pointed out: "It is a particularly grave matter from the standpoint of the Securities and Exchange Commission because we are a small Commission. We have a relatively small roster of personnel. * * * At your Honor's request, we filed two briefs in a very short space of time. * * * We have produced every witness that we have been requested to produce here. We have had all of our documents here. What we have done, in short, is to assert what we conceive to be our absolute right under the statute, under our rules to claim as privileged and confidential certain restricted categories of documents and information. The bulk of our documents and information we have freely made available to both sides in this proceeding. * * * if we are right, and our claim of privilege is validly asserted, and if ultimately held to be so by this court, or by an appropriate reviewing court, we think that this procedure by which we are being hung up in this court — I use the word respectfully — and being kept away from our ___." The court interrupted: "Detained perhaps would be the better word." The judge added that on a few occasions he had suggested to the counsel that he thought the latter was in contempt of court; that this was not meant as a threat but as kindly advice.
 
 
 55
 Examination of the attorney-witness was renewed. Counsel Timbers continued to defend the action of the Securities and Exchange Commission in its course throughout its investigation of the Monroe Paper Products Company matter. The court reproved the witness for his "continuous repetition of the same argument"; and ordered him to take the stand again. Attorney Brand asked whether he would read into the record portions of the report made by Rakow on February 10 in respect of his conference with Weipert on February 8, 1954. The witness respectfully declined to respond to the request, on the ground previously stated in relation to that document and also declined to answer the follow-up questions concerning it. He was asked whether he was willing to submit the report to the court for examination, so that the court could determine whether his claim of privilege was justified under the circumstances of the case. He replied that he certainly was, pursuant to his formal tender previously made but that he was unwilling to submit it under any other terms or conditions.
 
 
 56
 Attorney Brand then asked that the witness be ordered to produce the report, to which the court responded by addressing counsel Timbers: "You will have to produce it." The counsel reiterated that he would produce it pursuant to the tender made by the Commission. The judge said: "My order is that you produce it." The attorney stated, "I respectfully decline to do so, your Honor, on the grounds heretofore stated." Attorney Brand said that when he asked that the document be produced, he meant "produced to the court"; the judge added: "Delivered to me." An attorney for defendants objected to the court's order.
 
 
 57
 The counsel-witness was asked whether he was willing to submit the document to the court for determination. He said, "I am not, on the grounds ___." Mr. Brand interrupted; but the judge took over. He said: "It is a question of whether you will give it to him [indicating attorney Brand]. That is all." Mr. Brand said: "That is right." The court then said: "The answer, of course, is obvious. He has made no effort to get it. There is nothing for me to do but to hold you in contempt of court and to commit you to the custody of the Marshal forthwith. We can go ahead with some other matters, and I will interrupt these proceedings at any time that you are ready to go ahead with your hearing, but in the meantime, you will be in the custody of the Marshal." He then addressed the clerk: "Will you call the Marshal?"
 
 
 58
 The attorney adjudged in contempt asked: "May I respectfully request an adjournment, your Honor, in order to obtain counsel to represent me in connection with the proceedings now necessary to be taken, in view of your Honor's ___." The court interrupted: "I have made my final statement." Attorney Timbers repeated: "May I have counsel, your Honor?" The judge replied: "I said I have finished my statement."
 
 
 59
 An attorney for defendants requested that the court adjourn until the following day; and said that he thought it would be quite an unnecessary indignity to place a public official in the custody of the marshal any more than in a token sense. The judge replied that the suggestion would be taken under advisement. The Commission's general counsel again asked the benefit of counsel to advise him in connection with the court's order, pursuant to which he had been placed in the custody of the marshal. The judge said to him: "There is no question but what you are entitled to counsel." Attorney Timbers asked: "And may I have an adjournment in order to retain counsel?" The judge responded, "No." Attorney Timbers then said: "I hereby move, your Honor, for a stay of execution of your Honor's contempt until an appeal can be taken from that order to the United States Court of Appeals for the Sixth Circuit." The judge said: "A stay is denied."
 
 
 60
 Attorney Timbers said that, with the utmost respect and deference to the court but nevertheless vigorously, he wanted to direct the court's attention to the fact that a denial of a stay of the contempt order was in absolute contravention of the agreement which the judge had made with him in a telephone conversation in which the judge was talking from Detroit and the attorney from the library of the Supreme Court in Washington, D. C., a few days before he had first appeared in Detroit. The general counsel said: "At that time, your Honor understood that I was appearing, had been requested to appear as counsel for two men, members of the staff of the Commission, Mr. Holden and Mr. Rakow, whom you had threatened to hold in contempt of court. At that time, I asked your Honor if you should reach the point of holding anybody in contempt, anybody connected with the Securities and Exchange Commission, whether you would grant a stay of execution of the order of contempt in order to enable such person to prosecute his appeal to the court of appeals or whether I should make provision, as general counsel of the Commission, to have someone present in Cincinnati or at other appropriate place to obtain a stay from the court of appeals itself or from a judge thereof; in response to that inquiry, your Honor, you stated that it would be unnecessary for me to make any arrangements in advance to obtain a stay of execution from the court of appeals because your Honor, Judge Lederle, Chief Judge of this Court, would, yourself, grant that stay, and I submit, you have breached your promise to me at that time in declining to do so and in declining an adjournment to enable me to obtain an attorney to properly represent me now that you have deprived me of my liberty by your order of contempt." The judge answered: "I have no desire to get into a controversy with you about a telephone conversation. The marshal will take the prisoner." Attorney Timbers attempted to speak: "I again ___." The judge shut him off, saying: "We better take a recess until two o'clock."
 
 
 61
 In our opinion, Judge Lederle was not justified in punishing for contempt the General Counsel for the Securities and Exchange Commission for declining to produce the confidential intra-agency report of the Commission's investigation, when the attorney stood upon his necessary obedience to the rule, special instructions and claim of privilege of the SEC. The Securities Act of 1933, 15 U.S.C.A. § 77s(a), as amended by the Securities Exchange Act of 1934, 15 U.S.C.A. § 78w(a), provides that the Commission shall have authority from time to time to make and rescind such rules and regulations as may be necessary to carry out the purposes of the Act and the functions prescribed for the Commission. The Commission was vested with discretion to investigate any matter within the purview of its jurisdiction which it believed to be in the public interest to investigate.
 
 
 62
 Pursuant to statutory authority, the Commission adopted Rule 122 (17 C.F. R., section 230122) and Rule X-4 (17 C. F.R., section 240.0-4). Rule 122 provides: "Information or documents obtained by officers or employees of the Commission in the course of any examination or investigation * * * shall, unless made a matter of public record, be deemed confidential. Officers and employees are hereby prohibited from making such confidential information or documents available to anyone other than a member, officer, or employee of the Commission, unless the Commission authorized the disclosure of such information or the production of such documents as not being contrary to the public interest. Any officer or employee who is served with a subpoena requiring the disclosure of such information or the production of such documents shall appear in court and, unless the authorization described in the preceding sentence shall have been given, shall respectfully decline to disclose the information or produce the documents called for, basing his refusal upon this rule. Any officer or employee who is served with such subpoena shall promptly advise the Commission of the service of such subpoena, the nature of the information or documents sought, and any circumstances which may bear upon the desirability of making available such information or documents." Rule X-4 is identical with the foregoing rule, except for immaterial changes.
 
 
 63
 The record establishes that the appellant general counsel acted in conformity with the foregoing rules of the Commission. In doing so, he was protected in his claim of privilege by the principles announced in the opinions of the Supreme Court in United States ex rel. Touhy v. Ragen, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 and in Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L. Ed. 846. In the Touhy case, the issue directly involved was the right of a subordinate official of the Department of Justice to refuse to obey a subpoena duces tecum ordering him to produce papers of the department in his possession, where his refusal was based on a regulation issued by the Attorney General of the United States under 5 U.S.C.A. § 22. This regulation forbade an officer or employee of the Department of Justice, except in the discretion of the Attorney General, to permit the disclosure, for use for any purpose other than the performance of his official duties, of official files, documents, records and information in the offices of the Department of Justice, including those of its United States Attorneys and Marshals, the Federal Bureau of Investigation, and other named institutions. The Department of Justice Rule provided further: "Whenever a subpoena duces tecum is served to produce any of such files, documents, records or information, the officer or employee on whom such subpoena is served, unless otherwise expressly directed by the Attorney General, will appear in court in answer thereto and respectfully decline to produce the records specified therein, on the ground that the disclosure of such records is prohibited by this regulation."
 
 
 64
 The Supreme Court affirmed the reversal by the court of appeals of an adjudication by the United States District Court that an F. B. I. Agent was guilty of contempt for refusal to produce papers required by the subpoena duces tecum. In doing so, the court, upon authority of Boske v. Comingore, supra, upheld the validity of a regulation of the Department of Justice as to non-disclosure of documents under a directive of the Attorney General. At page 468 of 340 U. S., at page 419 of 71 S.Ct., Mr. Justice Reed said: "When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious." It is true that the Supreme Court found it unnecessary to consider the ultimate reach of the authority of the Attorney General to refuse to produce, by order of a court, government papers in his possession, inasmuch as the Attorney General was not before the trial court — just as in the instant case no member of the Securities and Exchange Commission was before the court.
 
 
 65
 In Boske v. Comingore, 177 U.S. 459, 469, 470, 20 S.Ct. 701, 705, 44 L.Ed. 846, a state court had adjudged a United States Collector of Internal Revenue to be in contempt for refusal to file certain reports in his custody as a subordinate officer of the Treasury Department, where he based such refusal upon regulations of the department. The collector was discharged by the United States District Court for Kentucky on writ of habeas corpus, and the Supreme Court affirmed. In re Comingore, 96 F. 552. The regulation made by the Secretary of the Treasury was pursuant to authority of a federal statute. Mr. Justice Harlan, writing for the unanimous court, said: "The papers in question, copies of which were sought from the appellee, were the property of the United States, and were in his official custody under a regulation forbidding him to permit their use except for purposes relating to the collection of the revenues of the United States. Reasons of public policy may well have suggested the necessity, in the interest of the government, of not allowing access to the records in the offices of collectors of internal revenue, except as might be directed by the Secretary of the Treasury. * * * great confusion might arise in the business of the department if the Secretary allowed the use of records and papers in the custody of collectors to depend upon the discretion or judgment of subordinates. At any rate, the Secretary deemed the regulation in question a wise and proper one, and we cannot perceive that his action was beyond the authority conferred upon him by Congress. * * * Those who insist that such a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress. In our opinion the Secretary, under the regulations as to the custody, use, and preservation of the records, papers, and property appertaining to the business of his department, may take from a subordinate, such as a collector, all discretion as to permitting the records in his custody to be used for any other purpose than the collection of the revenue, and reserve for his own determination all matters of that character."
 
 
 66
 We find no logic in the argument of the attorneys for appellees that there is any material difference in principle here in view of the circumstances that in the Touhy and Boske cases the regulations involved were promulgated by heads of departments of Cabinet rank, while in the instant case the regulation was promulgated by an important administrative agency created by Act of Congress and invested by the Act with rule-making powers.
 
 
 67
 An opinion of the Court of Appeals for the Ninth Circuit, written by Judge Wilbur, seems pertinent. Ex parte Sackett, 74 F.2d 922. There, the trial court adjudged an investigator of the Department of Justice guilty of contempt in failing to answer whether or not he had certain records in his possession and in declining to produce them if he had, and committed the government agent to the custody of the United States Marshal until such time as he should comply with the court's order. It was assumed that the documents were material evidence. Although the papers were physically in possession of the government agent who was called as a witness, the appeals court said that they were, under lawful regulations, in the custody of the Attorney General. In not disclosing them, the government investigator acted in pursuance of a rule promulgated by the Attorney General. It was held, upon the authority of Boske v. Comingore, supra, that such rule or regulation had the force of law and that the district court possessed no jurisdiction or power to punish an officer for conforming to that law. The petitioner for writ of habeas corpus was discharged from custody.
 
 
 68
 A helpful opinion, among numerous others upon the subject matter which could be cited as illustrative of the applicability of the doctrine of the Boske case, is Universal Airline v. Eastern Air Lines, 88 U.S.App.D.C. 219, 188 F.2d 993, 999, 1000. There, it was pointed out that the courts have recognized the right of administrative agencies to make reasonable regulations regarding their records and reports [citing the Boske case and several other authorities]; and have upheld regulations forbidding agency employees from testifying in suits between private parties concerning the contents of secret official records. Citing In re Lamberton, D.C.W.D.Ark., 124 F. 446; Stegall v. Thurman, D.C.N.D. Ga., 175 F. 813; United States v. Owlett, D.C.M.D.Pa., 15 F.Supp. 736. Judge Wilkin, retired United States District Judge for Northern Ohio, who wrote the opinion, said that the contention of the Civil Aeronautics Board was sound upon the proposition that it was error to compel its agent to produce any part of its reports, orders, or private files, or to testify as to the contents of such private files; that reports, or testimony concerning them, would be hearsay based upon hearsay; and that the rights of parties should be determined "by testimony adduced at the trial according to the rules of examination and cross-examination." [188 F.2d 1000.]
 
 
 69
 In Securities and Exchange Commission v. Torr, D.C.S.D.N.Y., 15 F.Supp. 144, District Judge Caffey held that, where Congress has conferred on the Securities and Exchange Commission the power to make a particular rule which does not invade some right of a defendant, the rule will not be disturbed by the court inasmuch as it is not within the province of the court to pass upon the wisdom of a regulation adopted by the Commission.
 
 
 70
 It is true, as argued by appellees, that "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers", United States v. Reynolds, 345 U.S. 1, 9, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727; and that it is "the responsibility of all courts to see that no unauthorized extension or reduction of jurisdiction, direct or indirect, occurs in the federal system", Baltimore Contractors v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 253; but it should be borne in mind that the Supreme Court has explicitly said that, just as a judge cannot be subjected to scrutiny as to mental processes and his examination would be destructive of judicial responsibility, so also the integrity of the administrative process must be equally respected; and that "it will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of the courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1005, 85 L.Ed. 1429.
 
 
 71
 Edwards v. United States, 312 U.S. 473, 481, 61 S.Ct. 669, 674, 85 L.Ed. 957, cited by appellees' counsel, is distinguishable in that a complete transcript of a hearing before the Securities and Exchange Commission was there demanded by the defendant in a criminal case. The Supreme Court said that it was "not an instance of the inspection of notes or material gathered by a prosecutor for his own use." We think that the opinion of the Supreme Court in Penfield Co. of California v. S. E. C., 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117, furnishes no guidance here.
 
 
 72
 Two Attorneys General of the United States, who later became members of the Supreme Court, made contributions to the subject with which we are presently concerned. Mr. Justice Clark, when Attorney General, stated in his Manual on the Administrative Procedure Act that the great mass of material relating to the internal operation of a governmental agency is not a matter of official record, nor are intra-agency reports of investigations such, reflecting as they do research and analysis preliminary to official action; and that, in view of their nature, they must commonly be kept confidential. Mr. Justice Jackson, when Attorney General, in one of his opinions, 40 Op.Attys.Gen. 45, declared that the courts have held repeatedly that they will not and cannot require the executive branch of government to produce papers which, in the opinion of the executive, would be contrary to the public interest to produce; and that this determination is for the executive and not for the courts. He cited numerous cases, beginning with Marbury v. Madison, 1 Cranch 137, 169, 2 L.Ed. 60, and including Boske v. Comingore, supra.
 
 
 73
 As his remarks plainly indicate in the instant matter, District Judge Lederle apparently took the view that a part of his function was to conduct a searching inquisition into what he considered to be neglectful inaction of the Securities and Exchange Commission in relation to the Monroe Paper Products Company's affairs. We think he overstepped appropriate judicial bounds. In Crooker v. Securities and Exchange Commission, 1 Cir., 161 F.2d 944, 949, the Court of Appeals held that it was without power to direct the Commission, at the instance of a private petitioner, to make an investigation or to institute injunction proceedings. See also Berlinsky v. Woods, Federal Housing Expediter, 4 Cir., 178 F.2d 265; General Drivers, etc. v. National Labor Relations Board, 10 Cir., 179 F.2d 492.
 
 
 74
 The basis of our decision is, as has been shown heretofore, that the Commission, its General Counsel, and its representatives Rakow and Holden, were within their lawful rights in declining to produce the reports and intra-agency communications demanded by the attorney for plaintiffs and by the district judge. In furnishing freely, as they did, the statements and communications to them by defendants and their attorneys, their correspondence with defendants and their attorneys, and the other data supplied, they performed all that the law required of them. Appellant Timbers was not, in our judgment, in contempt of court for standing upon his claimed privilege.
 
 
 75
 An additional independent basis of our decision is that, even if appellant Timbers had been in error in his interpretation of the law and the binding effect of the Commission's rules and directives upon which he based his declination to produce the information demanded, the district judge abused his discretion in committing the attorney to imprisonment for contempt in the circumstances of the case. As was stated recently [February 11, 1955], in relation to an attorney's status "when standing upon his rights" not to divulge the contents of papers claimed to be privileged: "It is difficult to imagine the occurrence of anything beyond pro forma detention while the necessary steps are taken to get an appellate review." Chapman v. Goodman, 9 Cir., 219 F.2d 802, 807.
 
 
 76
 In our view, the foregoing recital of the judge's own words and actions demonstrates that he abused all justifiable discretion. An attorney is entitled to consideration of a claimed privilege not to disclose information which he honestly regards as confidential and should not stand in danger of imprisonment for asserting respectfully what he considers to be lawful rights. If the attorney's position, in the opinion of the trial court, is wrong to the point of contempt, he should be so adjudged; but substantial justice would demand that he be given the benefit of counsel and an opportunity for review by an appellate court before being deprived of his liberty with the resultant ignominy.
 
 
 77
 Accordingly, both the oral order and the written order adjudging and committing appellant for contempt of court are reversed and set aside; and it is directed that appellant be completely absolved from any punishment for his alleged contempt.