**POLYMERS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 602, 603, Dockets 32204, 32205.**

United States Court of Appeals Second Circuit.

Argued May 21, 1969,

Decided July 24, 1969.

---

7. See text of section 1304, *supra.*

Francis J. Vaas, Boston, Mass. (Nelson G. Ross, Ropes & Gray, Boston, Mass., on the brief), for petitioner.

Elliott Moore, Atty., National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert E. Williams, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, FEINBERG, Circuit Judge, and TIMBERS, District Judge.[*]

TIMBERS, District Judge:

This case presents chiefly the question whether the National Labor Relations Board should have set aside a representation election because of alleged irregularities in its conduct, the Board having concluded that "desirable election standards were met and that no *reasonable* possibility of irregularity inhered in the conduct of this election."[1] (Emphasis added.) Subordinate questions presented are whether the Board should have held a hearing on the company's objections to the election and whether the Board was justified in refusing the company's request to inspect a Board document entitled "A Guide to the Conduct of Elections."

Polymers, Inc., a Vermont corporation engaged at Middlebury in the manufacture, sale and distribution of synthetic fibers, has petitioned for review of an order of the Board which directed it to cease and desist from refusing to bargain collectively with Teamsters, Chauffeurs, and Warehousemen's Local 597, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The Board has cross-petitioned for enforcement of its bargaining order. The key issue is whether the Board's certification of the union is valid; if so, the company's admitted refusal to bargain violated Section 8(a)(5) and (1) of the Act.

We hold that the Board did not abuse its discretion in finding, without a hearing, that the alleged irregularities in the conduct of the representation election, considered in light of all the facts and circumstances surrounding the election, did not raise a reasonable possibility of irregularity and thus did not require that the election be set aside. We also hold under the circumstances of this case that the Board was justified in refusing to produce the Guide.

Accordingly, we deny the petition of the company to set aside the order of the Board, and we enforce the Board's order.

I.

The essential facts regarding the conduct of the election are not in dispute. A split session election was held on November 15, 1966 at the company's plant in Middlebury. After the first morning session, the ballot box was sealed, taped and signatures were affixed. The Board agent in charge of the election then placed the box in the rear of his station wagon, along with a leather brief case containing blank ballots. The station wagon was locked. The agent, along with the company and union observers, walked to a nearby diner for coffee. The ballot box and blank ballots re-

---

[*] Chief Judge of the District of Connecticut, sitting by designation.

[1] The decision and order of the Board, issued March 14, 1968, is reported at 170 N.L.R.B. No. 33, 67 L.R.R.M. 1433 (1968). A further decision on the company's motion for reconsideration, issued January 31, 1969, is reported at 174 N.L.R.B. No. 42, 70 L.R.R.M. 1148 (1969).

mained in the locked station wagon parked 50 to 75 feet from the diner during the 30 to 45 minute period that the agent and observers were in the diner.

After the midmorning voting session, the ballot box again was sealed and signatures were affixed. The Board agent placed it under a sweater in the rear of his station wagon which he again locked. Taking the brief case with the blank ballots along with him, he remained away from the station wagon from approximately 11 A.M. to 2 P.M.

■ No objections were interposed, nor suspicions voiced, by the company to these procedures until after the ballots were counted and the union victory was made known.[2] The company thereafter asserted that the failure of the Board agent to adhere to appropriate safeguards in the sealing and custody of the ballot box, and in the security of the blank ballots, required that the election be set aside due to the existence of a "possibility of irregularity." Specific alleged deficiencies included (1) sealing of ballot box edges and slot with (easily removable) masking tape instead of gummed paper; (2) signing of names wholly on tape without continuation onto cardboard surface of ballot box; (3) taping of slot and signatures without extending tape onto cardboard surfaces; (4) failure of Board agent to ask observers whether they were satisfied with the manner of sealing; and (5) failure of Board agent to retain box in his custody between polling periods.

In addition to the above specific alleged deficiencies, the company's suspicions were aroused by the appearance of many ballots in neatly creased stacks at the time of initial tabulation, and the shift in sentiment from the results of a previous election,[3] contrary to indications the company is said to have had from its employees. On the basis of these factors, the company objected to the election.

## II.

The regional director conducted an investigation into the alleged irregularities. The Board affirmed his findings. Although the Board recognized that the conduct of the election did not comport with optimal safeguards of accuracy and security, and it acknowledged that the sealing of the ballot box could have been improved upon, it concluded that "desirable election standards were met and that no *reasonable* possibility of irregularity inhered in the conduct of this election." (Emphasis added.) Enlarging upon its specification of the "reasonableness" of the possibility as a determinative factor, the Board stated:

"We do not think, however, that the word 'possibility' could ever be construed in this context to have the connotation of 'conceivable.' The concept of reasonableness of the possibility must be imported into this test in order for it to have meaning."

Thus, the Board declined to apply a standard which would disregard the remoteness of the possibility of irregularity. On the facts before it, the Board concluded that there was only a remote possibility of the occurrence of two un-

2. The company contends that it was unaware of the "critical significance" of the manner in which the ballot box was sealed until it later was informed of the "slipshod and careless manner" in which the Board agent had retained custody of the box. While no waiver or estoppel arises from the company's first making its objections known after the ballots were tabulated, the Board agent was given no opportunity to rectify the alleged procedural deficiencies of the election. Cf. United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952),

cited in NLRB v. Thompson Transport Co., 406 F.2d 698, 701 (10 Cir. 1969): ". . . courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

3. The employee vote in favor of the union at the November 15, 1966 election was 73 to 51. At the 1965 election, many of the same employees having voted, the union was defeated 92 to 29.

likely events: that someone had entered the Board agent's locked station wagon during either the first session (when both ballot box and blank ballots were there) or the second session (when only the ballot box was there); and that such person had tampered with the box without leaving a trace of visible irregularity.

### III.

Polymers does not contend that the failure of the Board agent to adhere to insignificant procedures for safeguarding an election requires that it be set aside; but it urges, since the procedures of sealing and custody are so crucial to the ability of the interested parties to "know with certainty" that tampering has not occurred, that election results should not be certified when such deviations occur.

In the past the Board has refused to certify election results where a possibility of irregularity existed. Although the "reasonableness" standard applied in the instant election has not been articulated

explicitly in previous Board decisions, its applicability is evident both from the opinions themselves and from the instances in which the Board, as here, has declined to set aside elections.

Briefly, elections have been set aside where (1) three days after a discrepancy in the number of ballots was discovered, the ballots were found, the room having been locked during the three day period;[4] (2) the Board agent, while being transported between polling places by company and union observers, failed to seal or tape the ballot box;[5] (3) an unsealed package of blank ballots was left unguarded for twenty minutes in a polling area;[6] and, most recently, an unsealed ballot box remained unattended from two to five minutes.[7]

On the other hand, election results have been certified even though (1) blank ballots were in the voting area while the Board agent was not;[8] (2) an unsealed ballot box was in the possession of the agent and the company observer, the union observer having suddenly departed;[9] and (3) the Board

4. New York Telephone Co., 109 N.L.R.B. 788 (1954). The newly discovered ballots brought the total number of recorded votes to the proper figure. The Board noted that a more prompt and thorough check of the room at the time the discrepancy arose would have avoided the ensuing complications.

5. Tidelands Marine Services, Inc., 116 N.L.R.B. 1222 (1956). The Board held that retention by the agent of the unsealed ballot box during the time he was away from the polling place, under conditions which permitted access, created a serious irregularity, even though no challenge was made to his personal integrity.

6. Hook Drugs, Inc., 117 N.L.R.B. 846 (1957). Notwithstanding the absence of any evidence that the unsealed package had been disturbed, the Board held that the failure to seal, coupled with the ease of accessibility, constituted a serious irregularity. The election was set aside.

7. Austill Waxed Paper Co., 169 N.L.R.B. No. 169, 67 L.R.R.M. 1366 (1968). Rejecting speculation on what might have happened during this period, and with the stated purpose of maintaining high standards and avoiding any taint in the election process, the Board set aside the election.

8. General Electric Co. (Clock and Timer Dept.), 119 N.L.R.B. 544 (1957), rev'g, 118 N.L.R.B. 805. In distinguishing Hook Drugs, supra note 6, the Board noted it had been established that at no time did anyone other than the Board agent touch the blank ballots which, along with the ballot box, were in the voting area in full view of the observers. Its initial decision that tampering might have occurred was reversed (over a strong dissent) in light of the evidence before it.

9. Crown Drug Co., 123 N.L.R.B. 336 (1959). After a few seconds the box was sealed and the Board found that no improper access was possible during this brief interval.

agent was temporarily absent from the polling place.[10]

█ This line of conflicting precedents reflects the principle that each possibility must be assessed upon its own unique facts and circumstances, under expert analysis by the Board, to determine whether to certify or set aside. A *per se* rule of possibility would impose an overwhelming burden in a representation case. If speculation on conceivable irregularities were unfettered, few election results would be certified, since ideal standards cannot always be attained.

The rule of absolute possibility, urged by Polymers, recently has been rejected by the Fifth Circuit in affirming a certification order of the Board. NLRB v. Capitan Drilling Co., 408 F.2d 676 (5 Cir. 1969), enforcing 167 N.L.R.B. No. 18, 66 L.R.R.M. 1015 (1967). The company there alleged that a seam of the ballot box was not sealed with masking tape and that enough space remained to insert or remove ballots during the time the box was in the custody of the Board agent (pending the counting of the ballots on the subsequent day):

> "In essence, the Company's sole argument rests upon one missing strip of tape, and the uncorroborated speculation, based on that fact, that the ballot box could have been tampered with. We do not think that this offer of proof is sufficient to necessitate an evidentiary hearing or the setting

aside of the election." 408 F.2d at 677.

### IV.

█ The burden of setting aside an election is a heavy one and falls upon the party attacking it.[11] In the instant case, the decision of the Board to certify the union was neither arbitrary nor capricious, nor did it represent a departure from the principles by which the Board had made similar determinations in the past. The essence of the company's complaint was the ease with which the masking tape used on the ballot box could have been removed and the blank ballots inserted with fraudulent votes. These allegations presupposed a spontaneous reaction by unknown parties to the fortuity of the ballot box and blank ballots remaining in an unguarded but locked station wagon, and the perfect execution of a plan to tamper. (Worthy of a Holmes or Hitchcock plot, but hardly of labor-management relations in Vermont!) That such possibility is remote is simply beyond dispute. Rejection of the *per se* possibility rule advocated by the company requires rejection of its claims. The Board evaluated the possibility; if its expertise means anything, it should be given weight in determining, as here, whether procedures were adequate to safeguard a common part of its everyday operations.[12]

### V.

█ Hearings need not be held on objections to representation elections un-

---

10. Anchor Coupling Co., 171 N.L.R.B. No. 156, 68 L.R.R.M. 1235 (1968). The Board, distinguishing Austill Waxed Paper, *supra* note 7, held that such absence provided an insufficient basis upon which to set aside the election. There was no allegation of actual tampering and the employer's observer conceded that the ballot box had been protected during this interval.

11. NLRB v. Mattison Machine Works, 365 U.S. 123 (1961) (per curiam); Southwestern Portland Cement Co. v. NLRB,

407 F.2d 131, 134 (5 Cir. 1969), petition for cert. filed, 37 U.S.L.W. 3477 (U.S. May 14, 1969) (No. 1392).

12. While it is true that a Board agent could walk around town in between shift balloting with the ballot box padlocked to his wrist, some more practical approach to the problems of security in 8200 elections per year must be devised, especially where no contemporaneous objection is interposed to the procedures visibly employed.

less by prima facie evidence the moving party presents substantial and material factual issues which, if resolved in its favor, would warrant setting aside the election.[13] In NLRB v. Joclin Mfg. Co., 314 F.2d 627, 631–32 (2 Cir. 1963), we recognized that the Board's discretion in determining whether or not to hold a hearing was not unfettered, but we held that it could condition the right to a hearing on the existence of substantial and material issues: "[This] requirement [is] not only proper but necessary to prevent dilatory tactics by employers or unions disappointed in the election returns."[14] Where, as here, the Board accepts the factual allegations of the company, and no additional facts remain to be developed, a hearing is unnecessary.[15] Conclusory allegations based upon undisputed facts and questions raised regarding ultimate interpretations by the regional director, do not raise material and substantial issues requiring a hear-

ing.[16] Absent a change in circumstances, not present here, the Board's refusal to permit the introduction of additional evidence in an unfair labor practice proceeding, where the company has had full opportunity to present its claims to the regional director, will not be disturbed.[17] The inferences and conclusions which the company here wished to have drawn regarding the conduct of the election could be, and were, made known to the Board without the necessity of a hearing. The company's offer of proof was insufficient. As indicated above, accepting the facts as true, there was no warrant for setting aside the election. The request for a hearing was properly denied.

## VI.

The company sought, and was denied, access to a Board document entitled "A Guide to the Conduct of Elections."[18]

13. Under 29 C.F.R. § 102.69(c), challenges to representation elections are considered by the regional director "on the basis of an administrative investigation or, if it appears to the regional director that substantial and material factual issues exist which can be resolved only after a hearing, he shall issue and cause to be served on the parties a notice of hearing on said issues before a hearing officer." See Bausch & Lomb, Inc. v. NLRB, 404 F.2d 1222, 1226 (2 Cir. 1968); NLRB v. Capitan Drilling Co., *supra*, at 677; Southwestern Portland Cement Co., *supra* note 11, at 135, citing NLRB v. O.K. Van Storage, Inc., 297 F.2d 74, 76 (5 Cir. 1961):

"Nowhere in the Act is there a specific requirement that the Board conduct post-election hearings on objections to the conduct of elections; rather, it is implicit in the Act that questions preliminary to the establishment of the bargaining relationship be expeditiously resolved, with litigious questions reserved for the proceedings for review or enforcement of Board orders. The Board nonetheless makes it a practice to hold post-election hearings on objections to elections, but in keeping with the spirit of the Act does so only when it appears that the allegations relied on to overturn the election have a basis in law and that there is evidence

to support them. The opportunity for protracted delay of certification of the results of representation elections which would exist in the absence of reasonable conditions to the allowance of a hearing on objections is apparent. An objecting party who fails to satisfy such conditions has no cause for complaint when and if his demand for a hearing is denied."
See also NLRB v. Genesco, Inc., 406 F. 2d 393 (5 Cir. 1969); NLRB v. Smith Industries, Inc., 403 F.2d 889, 892 (5 Cir. 1968); Sonoco Products Co. v. NLRB, 399 F.2d 835, 839 (9 Cir. 1968).

14. See Sonoco Products Co. v. NLRB, *supra* note 13.

15. NLRB v. Bata Shoe Co., 377 F.2d 821 (4 Cir.), cert. denied, 389 U.S. 917 (1967).

16. NLRB v. Difco Laboratories, Inc., 389 F.2d 663 (6 Cir.), cert. denied, 393 U.S. 828 (1968); Macomb Pottery Co. v. NLRB, 376 F.2d 450, 452 (7 Cir. 1967).

17. Pepsi-Cola Buffalo Bottling Co. v. NLRB, 409 F.2d 676, 681 (2 Cir. 1969).

18. A parallel request for production of the "NLRB Case Handling Manual" was granted by the Board.

The Board's denial is challenged as in contravention of the Freedom of Information Act of 1966, 5 U.S.C. § 552, and in violation of due process. As to the statutory claim, § 552(a)(2)(C) requires an agency to make available "administrative staff manuals and instructions to staff that affect a member of the public." This provision, however, is subject to certain limitations; § 552(b)(2) excepts from the operation of the statute matters that are "related solely to the internal personnel rules and practices of an agency." The House Report interpreted this exception to cover "[o]perating rules, guidelines and manuals of procedure for government investigators or examiners. . . ."[19]

The Guide is said to be an internal advisory document for the use of Board personnel and plays no significant role in the Board's adjudication of election disputes. As such it appears to fall within the further exception specified in 5 U.S.C. § 552(b)(5) as an "intra-agency memorandum."[20]

While the interest of the Board in refusing to produce the Guide is not clear, its relevance to the instant controversy is even less clear. We do not hold that under no circumstances would the Board be required to produce the Guide; but in the context of the instant case we will not disturb the refusal of the Board to produce the Guide.

Enforced.

---

19. 1966 U.S.Code Cong. & Ad.News, 2418, 2427. But see Benson v. General Services Administration, 289 F.Supp. 590, 594–95 (W.D.Wash.1968), criticizing the interpretation of the House Report and discussing the Senate Report, which interpreted the phrase "internal personnel rules and practices" as relating to "parking facilities, . . . lunch hours, statements of policy as to sick leave, and the like."

20. The House Report found merit in the contention of agency personnel that "Exchange of ideas among agency personnel would not be completely frank if they were forced to 'operate in a fishbowl.'" 1966 U.S.Code Cong. & Ad.News, *supra* note 19. See also American Mail Line, Ltd. v. Gulick, 311 F.2d 696, 703 (D.C. Cir. 1969).

We are not insensitive to the importance of withholding intra-agency memoranda from public disclosure in appropriate circumstances. See In the Matter of the Appeal of the SEC, 226 F.2d 501 (6 Cir. 1955) (Brief for Appellants, 36–37, 62, 77–79, 84–86).