**K. C. WU, Plaintiff-Appellant,**

v.

**NATIONAL ENDOWMENT FOR HU-MANITIES and Wallace B. Edgerton, as Acting Chairman For the National Endowment For the Humanities, De-fendants-Appellees.**

No. 71-2852.

United States Court of Appeals,
Fifth Circuit.

May 2, 1972.

Anton F. Solms, Jr., Savannah, Ga., for plaintiff-appellant.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., David D. Rawlins, Asst. U. S. Atty., Savannah, Ga., Walter H. Fleischer, Raymond D. Battocchi, Dept. of Justice, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before TUTTLE, GEWIN and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellant was born in 1903 in China, where he received a "classical" Chinese education. He has lived in the United States for a number of years and is presently a college professor in Georgia. About 1966 appellant became convinced that most Chinese histories available in the United States were replete with factual errors. He attributes this deficiency to the inadequate training of Western sinologues, few, if any, of whom have had the benefit of a "classical" education.

In hope of correcting the errors he perceived, appellant wrote an article, "Local Government in Imperial China," which he submitted to the Journal of Asian Studies, the official publication of the Association for Asian Studies. The article was not accepted for publication. Appellant reacted by writing numerous letters over a period of a year and a half to the editors of the Journal, challenging their rejection and asking for detailed

reasons for their decision. Dissatisfied with their response, appellant compiled a booklet that consisted of a brief introduction and conclusion and the forty-two letters comprising his correspondence with the Journal. He sent the booklet to "nearly every known China specialist in this country inviting them to refute [his] criticisms."[1] In addition, he wrote to the presidents of Harvard, Yale, Cornell, Michigan, California, and other colleges and universities, requesting them to urge their China scholars to refute his allegations of error. None of the China scholars replied.

Having failed to generate debate or discernible interest in his theories, appellant concluded he should write a comprehensive history of China in which he would correct the errors he was concerned about. To assist him in this project, he applied to the National Endowment for the Humanities, a federal agency, for a $70,000 grant. Under Endowment procedures, this application was referred initially to five experts on Chinese history, each of whom is a professor of history at an American university. Four of these professors submitted written reviews and the fifth provided an oral review and requested that his comments be kept confidential. Each of the reviewers recommended rejection of the application. Secondly, the application, along with others, was referred to a panel of outside experts who consult the Endowment on the humanities generally but not necessarily on Chinese history in particular. This panel recommended rejection of the application. Next it was referred to a committee of full-time staff members of the Endowment, who reviewed it along with all other applications in the research program. This committee also recommended rejection. Through this third level of consideration, each reviewer who assigned a numerical rating to the application assigned it a rating of "two." This rating signifies that the application is of poor quality and should not be funded even if enough money is available to support every application to the Endowment. Finally, the application was referred to the National Council on the Humanities which rejected it. The Chairman of the Endowment formally advised plaintiff of the rejection.

Appellant brought this action under the Freedom of Information Act, 5 U.S. C.A. § 552(a) (3) which provides in part:

> (a) Each agency shall make available to the public information as follows:

> (3) [E]ach agency, on request for identifiable records . . . shall make the records promptly available to any person. On complaint, the district court of the United States . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. ·

Appellant sought the following information:

> Records, or portions of records, which contain the refutations of each and all of the Defendants' five China specialists and which have been made by said specialists against complainant's criticisms of Western scholarship in the field of Chinese studies which were included in and were a part of Complainant's application to the Endowment and which application was

---

1. Appellant's brief provides us with a summary of two of his criticisms of Western Chinese scholarship:
   (2) The Chinese never called their country "Flower Kingdom." The mistake was first made by Father Matthew Ricci around 1600 A.D.; but over these centuries not a single sinologue has realized that it was a mistake and sought to correct it. And (3) even in the matter of Confucianism, the one most important aspect of the Chinese culture, no Western scholar seems to have shown complete understanding. This is evidenced by the fact that though the translations of the Confucian classics were done by James Legge a century ago and are full of mistakes and obscurities, these are still being cited as standard works and used as a basis for the study of Confucianism.

**1032**

known under Reference No. Application H–4344 and was dated January 22, 1970.

Records or portions of records, which contain all of the facts or evidence which each and all of the Defendants' five China specialists gave to the said Defendant, National Endowment for the Humanities, in support of their statement that Complainant's training is not equal to the task which he has set himself to, that is, to write a new comprehensive "History of China," which would correct many mistakes heretofore made by Western scholars.

The Endowment resisted vigorously, fearing that if its outside consultants were subjected to one of appellant's massive letter-writing campaigns the Endowment would lose their services. Mr. Emerson, an Endowment official, said in his affidavit:

These outside reviewers are not paid but furnish evaluation as a public service for the good of the humanities. Sometimes, they specifically ask that their recommendations be kept confidential. Even when such a specific request is not made, however, it is vital for the Endowment that their recommendations not be available to applicants; only then can reviewers be free to state their true opinion of an application without regard to the feelings of the applicant.

The Endowment based its defense on exemption (5) of the Freedom of Information Act:

§ 552

(b) This section does not apply to matters that are—

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

The district court granted summary judgment for the Endowment, concluding that the records sought came within the purview of exemption (5).

■ We agree with the district court that the work product of the Endow-

ment's China specialists are intra-agency memoranda even though the five professors were not actually agency employees. In Soucie v. David, D.C.Cir.1971, 448 F. 2d 1067, 1078 n. 44 the court said:

The rationale of the exemption for internal communications [exemption (5)] indicates that the exemption should be available in connection with the Garwin Report even if it was prepared for an agency by outside experts. The Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity. A document like the Garwin Report should therefore be treated as an intra-agency memorandum of the agency which solicited it.

Extending exemption (5) to outside consultants is especially appropriate in the instant case since Congress specifically empowered the Endowment to "utilize from time to time, as appropriate, experts and consultants." 20 U.S.C. § 959(a)(4).

■ The remaining question before us is whether the intra-agency memoranda at issue here would "be available by law to a party other than an agency in litigation with the agency," 5 U.S.C.A. § 552(b) (5), *supra,* that is, would the memoranda be subject to discovery by a party in litigation with the Endowment? It has been consistently held that "purely factual" material, which is generally discoverable under Fed.R.Civ.P. 26(b), is not protected from disclosure by exemption (5). In contrast, advice, recommendations, opinions, and other subjective material are protected.

[Exemption (5)] was intended to encourage the free exchange of ideas during the process of deliberation and policy-making; accordingly, it has been held to protect internal communications consisting of advice, recommendations, opinions, and other material reflecting deliberative or policy-making processes, but not purely factual or investigatory reports. Soucie v. David, *supra,* at 1077.

The statute exempts "inter-agency or intra-agency memorandums or letters which would not be available to a party other than an agency in litigation with the agency." . . . This provision encourages the free exchange of ideas among government policy makers, but it does not authorize an agency to throw a protective blanket over all information by casting it in the form of an internal memorandum. Purely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only "those internal working papers in which opinions are expressed or policies formulated and recommended." Bristol-Myers Co. v. FTC, 1970, 138 U.S.App.D.C. 22, 424 F.2d 935, 939.

*Accord,* General Services Admin. v. Benson, 9th Cir. 1969, 415 F.2d 878, 880. Appellant argues that these cases support his position, since all he seeks is academic knowledge that is in the truest sense "purely factual." We disagree. The records he wants on the inadequacy of his academic background are opinions, not facts, and are thus protected by exemption (5). The agency's consultants simply concluded from the facts appellant submitted that in their opinion his training was inadequate. The agency is withholding only the opinions of its experts, not any facts.

We turn now to the second category of information sought by appellant, the consultants' memoranda on the merits of his proposed project. Again we apply the "purely factual" test to determine if these memoranda are exempt from disclosure. The test is, of course, not an ironclad one, since virtually any memorandum prepared for an agency will contain some factual material along with the opinions and recommendations. A careful case-by-case analysis of the material sought is thus necessary. We believe, however, the "purely factual" rule can be better understood when viewed in the context of the cases in which it has been employed. The material at issue in these cases has always been predominantly, if not purely, factual information that is

not generally available to the public. Mink v. Environmental Protection Agency, D.C.Cir.1971, 464 F.2d 742 (report on the environmental aspects of the Amchitka Island nuclear test); Soucie v. David, *supra,* (report evaluating the Government's program for development of the Supersonic Transport); General Services Admin. v. Benson, *supra,* (records of property sale); Consumers Union of United States v. Veterans' Admin., 301 F.Supp. 796 (S.D.N.Y.1969) (records of hearing aid tests).

In contrast, in the instant case the memoranda sought are not factual or scientific reports but recommendations containing the opinions of five China specialists on the merits of appellant's application for a federal grant. Such recommendations will usually contain some factual material but it is only incidental to their primary purpose, which is the expression of an opinion to assist the agency in reaching a decision on the grant. There was no requirement here for the consultants to "refute" appellant's theories. We do not think the fact that one or more of the five either included some factual material in his memorandum or stated to the Endowment that he was able to refute appellant's arguments transforms these opinions into factual matter within the meaning of the "purely factual" rule.

Appellant bases his case more on policy than on statutes or case law. He firmly believes that the failure of the academic community to respond to his theories on China is reprehensible at best. The courts are apparently his last resort in his effort to generate debate. The Endowment responds with its own policy argument. It says requiring disclosure of these memoranda would seriously weaken its program, which rely heavily on unpaid outside experts. Just as professors would be hesitant to render opinions on their students who apply for Government-supported scholarship if they knew their recommendations were to be made public to "any person," they would be equally hesitant to assist the Endow-

**1034**

ment on grant applications if their comments were available to the public.

In Ackerly v. Ley, 1969, 137 U.S.App. D.C. 133, 420 F.2d 1336, 1341, the court said:

> * * * we accept the Commissioner's contention that the Congress intended that Exemption (5) was to reflect the privilege, customarily enjoyed by the Government in its litigations, against having to reveal those internal working papers in which opinions are expressed and policies formulated and recommended.

> The basis of Exemption (5), as of the privilege which antedated it, is the free and uninhibited exchange and communication of opinions, ideas, and points of view—a process as essential to the wise functioning of a big government as it is to any organized human effort. In the Federal Establishment, as in General Motors or any other hierarchical giant, there are enough incentives as it is for playing it safe and listing with the wind; Congress clearly did not propose to add to them the threat of cross-examination in a public tribunal.

In International Paper Co. v. FPC, 2d Cir. 1971, 438 F.2d 1349, 1358–1359, another court of appeals wrote:

> To allow disclosure of these documents would interfere with two important policy considerations on which § 552 (b) (5) is based: encouraging full and candid intra-agency discussion, and shielding from disclosure the mental processes of executive and administrative officers . . . . (citations omitted).

> There is embodied in § 552(b) (5) "the privilege, customarily enjoyed by the Government in its litigations, against having to reveal those internal working papers in which opinions are expressed and policies formulated and recommended." (citations omitted) The appellant's requested discovery must be denied under the fifth exception, because it seeks the disclosure of items used in the FPC's deliberative processes.

We believe the memoranda at issue in the instant case are "internal working papers in which opinions are expressed" and are involved in the Endowment's "deliberative processes." They are, therefore, protected from disclosure by exemption (5). Moreover, we agree with the Endowment that disclosure of the records sought could severely hamper its work. The community of Chinese scholars and of others in specialized fields is small, and the members are the only ones qualified to evaluate each other's work. Surely they would be hesitant to be frank with the Endowment in their evaluations of a colleague's work if they knew he could readily obtain their comments from the Endowment. The Endowment's interest in retaining the services of these outside experts clearly outweighs the public's interest in whatever factual excerpts there may be in the memoranda appellant seeks.

Affirmed.