Michael T. ROSE et al., Plaintiffs-Appellants,

v.

DEPARTMENT OF the AIR FORCE et al., Defendants-Appellees.

No. 9, Docket 73–1264.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1973.

Decided March 29, 1974.

Barrington D. Parker, Jr., New York City (American Civil Liberties Union Foundation, John H. F. Shattuck, Melvin L. Wulf, Sanford Jay Rosen, New York City, on the brief), for plaintiffs-appellants.

Leonard Schaitman, Asst. Chief, Appellate Section, Dept. of Justice, Washington, D. C. (Harlington Wood, Jr., Asst. Atty. Gen., Donald Etra, Atty., Dept. of Justice, Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., William R. Bronner, Gerald A. Rosenberg, T. Gorman Reilly, Asst. U. S. Attys., on the brief), for defendants-appellees.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

We are faced in this case with construing two of the exemptions in the Freedom of Information Act (the Act), 5 U.S.C. § 552, one of the many recent federal statutes that bring new and difficult cases into the federal courts.[1] As is frequently the case with such legislation, we have little to guide us in the way of precedent, and the brevity and generality of the statutory formulations leave much to be decided by the courts.

## I

Appellant Michael T. Rose, a graduate of the United States Air Force Academy (the Academy) was—at the time this complaint was filed—a third year student at the New York University Law School and a member of the Law Review. Together with other students and members of the Review, Rose has been conducting a survey of disciplinary systems at various Service Academies; the study is slated for publication in a forthcoming issue of the Review.[2] In order to document discussion of the Academy's Honor and Ethics Codes, Rose asked the Academy in autumn 1971 to give him copies of case summaries of Honor and Ethics Code adjudications, which were kept in the Academy's files. The Department of the Air Force

---

1. See Associated Indus. of N. Y. S., Inc. v. United States Dep't of Labor, 487 F.2d 342, 344–345 & n. 1 (2d Cir. 1973), and statutes cited therein.

2. Its tentative title is "The Administrative Adjudicatory Systems of the Service Academies: Constitutional Powers and Limitations."

refused on the ground that these summaries are exempted from compulsory release by 5 U.S.C. § 552(b)(6), which permits an agency to withhold certain information to avoid unwarranted invasion of privacy.[3]

After exhausting his administrative remedies, Rose joined with appellants Charles P. Diamond and Lawrence B. Pedowitz (who were then, respectively, the current and former Editor-in-Chief of the Review) in this lawsuit under the Act to compel disclosure of the disputed items "with personal references or other identifying information deleted . . . .". Judge Lloyd F. MacMahon of the United States District Court for the Southern District of New York granted appellees (collectively the Agency) summary judgment on the issue of the case summaries.[4] Although ultimately ruling against appellants, the judge agreed with them in large part. The Agency put forth two grounds in the district court to support its non-production of the documents: the Act's "personal privacy" exemption, referred to above, and the court's "equitable discretion" to deny disclosure. The judge rejected both arguments. However, he ruled for appellees on a third ground not advanced by them, that the summaries were covered by the exemption in 5 U.S.C. § 552(b)(2) for an agency's internal rules and practices. Attacking the district court's order refusing them access to the summaries, appellants prosecute this appeal. We reverse and remand for further proceedings conforming with this opinion.

II

■ We begin by stressing that the Freedom of Information Act[5] was passed in an effort to cure the defects of former section 3 of the Administrative Procedure Act (APA), 5 U.S.C. § 1002 (1964), which "was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute."[6] Courts have noted that the Act's remedial purpose was to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny. See, e. g., Hawkes v. Internal Revenue Service, 467 F.2d 787, 791 (6th Cir. 1972); Bristol-Myers Co. v. FTC, 138 U.S.App.D.C. 22, 424 F.2d 935, 938, cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). They have accordingly held that exemptions must be narrowly construed. Vaughn v. Rosen, 484 F.2d 820, 823 (D.C.Cir. 1973), cert. denied, 415 U.S. 977, 94 S. Ct. 1564, 39 L.Ed.2d 873 (1974); Soucie v. David, 145 U.S.App.D.C. 144, 448 F. 2d 1067, 1080 (1971). This liberal reading of the Act's disclosure provisions is supported not only by legislative history but, more importantly, by the statutory language, as well. The Act mandates release of documents to "any person"[7]

---

3. The Air Force also relied on the corresponding Air Force Regulations, A.F.R. 12–30.4f and 12–30.4g(1)(b), 32 C.F.R. § 806.-5(f), (g)(1)(ii) (1972).

4. The district court granted appellants summary judgment with regard to the third item requested, a complete study of resignations by Academy graduates from the Air Force. Appellees have already complied with this portion of the court's directive, and thus do not appeal from it.

5. 80 Stat. 250 (1966), codified by 81 Stat. 54 (1967), 5 U.S.C. § 552.

6. Environmental Protection Agency v. Mink, 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed. 2d 119 (1973). See also S.Rep.No.813, 89th

Cong., 1st Sess. 3, 4–6 (1965) [hereinafter Senate Rep.]; H.R.Rep.No.1497, 89th Cong., 2d Sess. 4–6 (1966), U.S.Code Cong. & Admin.News 1966 p. 2418 [hereinafter House Rep.]; Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act, quoted in 20 Admin.L.Rev. 263–316, at 267–68 (1968). See generally Note, The Freedom of Information Act: Shredding the Paper Curtain, 47 St. John's L.Rev. 694 (1973) [hereinafter St. John's Note].

7. Former section 3 of the APA, 5 U.S.C. § 1002 (1964), provided for disclosure only "to persons properly and directly concerned." Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 765 (1967) [hereinafter Davis].

(subject to explicitly defined exemptions);[8] grants to the district courts jurisdiction to enjoin improper withholding after a hearing "de novo" in which "the burden is on the agency to sustain its action," 5 U.S.C. § 552(a)(3); and further calls for disclosure "except as *specifically* stated in this section." 5 U.S.C. § 552(c) (emphasis added).[9] With this background in mind, we turn to a discussion of the applicability of Exemption Two, 5 U.S.C. § 552(b)(2), the provision thought by the district court to support the Agency's refusal to turn over the contested summaries to appellants.

■ As already indicated, until the district court ruled none of the appellees

had thought to rely on Exemption Two in refusing to turn over the case summaries. That section of the Act, see note 8 supra, shields from required disclosure all "matters that are . . . related solely to the internal personnel rules and practices of an agency . . .". In some instances, the scope of the exemption may be open to considerable doubt since the Senate and House Reports diametrically clash.[10] The former cites as examples of excluded material "rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like." Senate Rep. 8. The latter, on the other hand, exempts from disclosure "[o]perating rules,

8. 5 U.S.C. § 552(b) lists the exemptions from compulsory disclosure. It states:
This section does not apply to matters that are—
(1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy;
(2) related solely to the internal personnel rules and practices of an agency;
(3) specifically exempted from disclosure by statute;
(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency;
(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or
(9) geological and geophysical information and data, including maps, concerning wells.

9. 5 U.S.C. § 552(a)(3) reads as follows:
Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, on request for identifiable records made in accordance with published rules stating the time,

place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member. Except as to causes the court considers of greater importance, proceedings before the district court, as authorized by this paragraph, take precedence on the docket over all other causes and shall be assigned for hearing at the earliest practicable date and expedited in every way.
5 U.S.C. § 552(c) provides:
This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

10. See generally Project, Federal Administrative Law Developments—1972, Developments Under the Freedom of Information Act—1972, 1973 Duke L.J. 178, 187–89 [hereinafter Duke Project]; St. John's Note 716–17; Davis 785–86.

guidelines, and manuals of procedure for Government investigators or examiners" but not "'matters of internal management' such as employee relations and working conditions and routine administrative procedures. . . ." House Rep. 10. 1966 U.S.Code Cong & Admin. News p. 2427. The Senate Report is thought by many to comply with the statutory language better than the House Report, whose thrust is most frequently toward non-disclosure.[11] This court has not yet taken a firm stand on the issue. Cf. Frankel v. SEC, 460 F.2d 813, 816 & n. 5 (2 Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 125, 34 L.Ed.2d 146 (1972); Polymers, Inc. v. NLRB, 414 F.2d 999, 1006 (2 Cir. 1969), cert. denied, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970). We conclude, however, that the difference of approach between the House and Senate Reports would not affect the result here.

If we adopt the Senate construction of Exemption Two, case summaries of Honor and Ethics Code adjudications clearly fall outside its ambit. Such summaries have a substantial potential for public interest outside the Government. Appellants have drawn our attention to various items such as newspaper excerpts, a press conference by an Academy officer and a White House Press Release, which illustrate the extent of general concern with the working of the Cadet Honor Code. As the press conference and the Press Release show, some of the interest has been generated—or at least enhanced—by acts of the Government itself. Of course, even without such official encouragement, there would be interest in the treatment of cadets, whose education is publicly financed and who furnish a good portion of the country's

future military leadership. Indeed, all sectors of our society, including the cadets themselves, have a stake in the fairness of any system that leads, in many instances, to the forced resignation of some cadets. The very study involved in this case bears additional witness to the degree of professional and academic interest in the Academy's student-run system of discipline. Moreover, as we later describe in greater detail, see Part III infra, the case summaries themselves have great impact on the lives and careers of subject cadets. Both of these factors—the legitimate public interest and the future effect on cadets—differentiate the summaries from matters of daily routine like working hours, which, in the words of Exemption Two, do relate "*solely* to the internal personnel rules and practices of an agency." (Emphasis added.)

Similarly, even the House Report, which is usually more agency-oriented, does not sanction withholding the summaries. As we have already noted, the House Report in this respect seems to permit greater disclosure of "matters of internal management," except where knowledge of administrative procedures might help outsiders to circumvent regulations or standards.[12] Release of the summaries, which constitute quasi-legal records, poses no such danger to the effective operation of the Codes at the Academy.

Speculating about a different kind of threat to the effectiveness of the Code, the Agency claims that publication of this material might gravely undermine the whole basis of the Honor Code system, whose proceedings are cloaked in confidentiality. The matter of confidentiality is further discussed in Part III

---

11. Davis 762–63, 785–86; St. John's Note 697. See Hawkes v. Internal Revenue Service, 467 F.2d 787, 794 (6th Cir. 1972), pointing out, inter alia, that the Senate Report furnishes the surer guide to congressional intent since it alone was before both Houses (the Senate passed the bill first); Getman v. NLRB, 146 U.S.App.D.C. 209, 450 F.2d 670, 673 n. 8 (1971), and cases cited therein.

12. See, e. g., Tietze v. Richardson, 342 F. Supp. 610 (S.D.Tex.1972) (Social Security claims processing guidelines); Cuneo v. Laird, 338 F.Supp. 504 (D.C.D.C.1972) ("play-book" parts of contract audit manual), remanded sub nom. Cuneo v. Schlesinger, 484 F.2d 1086 (D.C.Cir.1973); Concord v. Ambrose, 333 F.Supp. 958, 960 (N.D.Cal.1971) (law enforcement agent training manual) (dictum).

infra. It is enough here to point out that appellants have sought only "sanitized" versions of the case summaries with names "or other identifying information" removed. In response to the redaction point, the Agency argues "that there is no way in which the total success of the deletion process can be guaranteed" and that "the functioning of the Honor and Ethics Codes would be seriously impaired even if inadvertent disclosure is a mere possibility." [13] But "total success"—in editing, as in anything else—is an impossible standard and surely not one imposed by a statute based upon a general philosophy of full agency disclosure to the public. Given this policy, as well as the injunction to construe exceptions to the Act strictly, 5 U.S.C. § 552(c), we think it clear that the Agency's withholding of the case summaries (as edited to preserve anonymity) cannot be upheld by reliance on the second exemption.

### III

■ The Agency also argues that the summaries sought by appellants fall within the purview of Exemption Six of the Act, 5 U.S.C. § 552(b)(6), which covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . ." As already indicated, Judge MacMahon did not agree with appellees on this point, but they renew their argument in this court. On its face, Exemption Six appears relevant; we are dealing here with "personnel" or "similar files." But the key words, of course, are "a clearly unwarranted invasion of personal privacy," a wholly conclusory phrase, which requires a court to apply the statutory standard without any definite guidelines. Under these circumstances, precedent lends only marginal aid. Each case involves an essentially unique investigation into the nature of the privacy interest invaded and the extent of the proposed invasion, viewed in the light of contemporary mores and sensibilities as applied to the particular facts.

The data pertinent to our inquiry concern the characteristics and use of the Honor and Ethics Code case summaries. These, the Agency tells us, are extracts of the significant facts in each case heard by the Honor Committee and in some important cases heard by the Ethics Committee. (The Ethics program is administered more informally.) As a matter of custom and procedure, information regarding such cases is required to be held in the strictest confidence. The summaries are, however, posted in the forty squadrons and, upon their official release, Honor Representatives are permitted to discuss any feature of the cases with the cadets for their education. The documents are also distributed to Academy personnel who have a "need to know." (In not guilty or so-called "discretion" [14] cases the name of the accused is deleted; in guilty cases it is not.) Therefore, in practice, the curtain of confidentiality appears to shield these records from the glare of external publicity but not from the eyes of present cadets—and future ones, who can read the summaries of past proceedings in the Honor and Ethics Code reading files.

These being the facts, one might ask in what way release of the summaries—with names omitted—could increase the potential for invading the privacy of affected cadets. To be sure, some cases might be recognized by readers of the Law Review article even in the absence of names, by virtue of the circumstances alone. However, it can be argued, only current and former cadets and Academy

---

13. Appellees' brief at 26 & n. 9.

14. The Honor Reference Handbook of the Air Force Cadet Wing states that, by vote of six out of eight Honor Representatives, a cadet may be found guilty with discretion and returned to the Wing in good standing. A discretion vote indicates a "conviction that the man has learned a lifelong lesson and that he will thereafter uphold the ethical standards of the Wing." Honor Reference Handbook 44 (1970).

officials possess the frame of reference which would enable them to reconstruct the incidents described in the summaries, for only they had had access to these records originally. Under these conditions, one might conclude that disclosure of the summaries poses no greater threat to privacy than the Academy itself countenanced through limited distribution and official posting of the items, and that it therefore constitutes no "invasion" at all. This reasoning was substantially the basis of the district court ruling that Exemption Six did not bar disclosure.

█ This approach, however, ignores certain practical realities. First, a person's privacy may be as effectively infringed by reviving dormant memories as by imparting new information.[15] Cf. Prosser on Torts 827–28 (4th ed. 1971). For example, a senior officer and ex-cadet might, upon reading a summary or a reference to it, realize for the first time that a man under his command had once been the subject of Academy discipline. It would be cold comfort to the junior officer to be told that his chief had always "known" this fact anyway, although he had long forgotten it or had never made the ultimate connection among various bits of knowledge until the article jogged his recollection.

█ Then, too, publication of even anonymous summaries could expose the histories of formerly accused cadets to persons other than Air Force officers. Despite the continuing injunction of secrecy, no one can guarantee that all those who are "in the know" will hold their tongues, particularly years later when time may have eroded the fabric of cadet loyalty. Finally, we must remember that none of the parties to this lawsuit is committed first and foremost to the interests of affected cadets. It is no slur on appellees to note that they are primarily defending the integrity of their own procedures while appellants, of course, are pressing for disclosure. In these circumstances, we will not hold that the Agency's internal dissemination of the summaries lessens the concerned cadets' right to privacy, as embodied in Exemption Six.

█ However, while release of even nameless case histories might constitute an "invasion" of protected interests, the inquiry does not end there. The statute requires the Agency to show that the invasion is "unwarranted"—indeed, that it is "clearly" so. The only opinion at all in point, Getman v. NLRB, 146 U.S. App.D.C. 209, 450 F.2d 670 (1971), held that law professors engaged in an NLRB voting study could compel that agency to provide them with names and addresses of eligible employee voters since disclosure would not entail an impermissible intrusion into privacy.[16] But Getman was a much stronger case for plaintiffs than ours since release of the desired information would subject the employees named to nothing more than a telephone request to submit to a voluntary interview. 450 F.2d at 674–675. Here, by contrast, identification of disciplined cadets—a possible consequence of even anonymous disclosure—could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends. Viewing this potential for serious harm from the perspective of our society's ex-

15. But cf. A.F.R. 12–30.g(2)(a), 32 C.F.R. § 806.5(g)(2):
  In determining whether the release of information would result in a clearly unwarranted invasion of privacy, consideration should be given, in cases such as those involving alleged misconduct, to: (i) The amount of time that has passed since the alleged misconduct . . . .

16. See Note, Invasion of Privacy and the Freedom of Information Act: Getman v. NLRB, 40 Geo.Wash.L.Rev. 527 (1972). We have found only three other appellate decisions dealing with Exemption Six, only one of which—Robles v. Environmental Protection Agency, 484 F.2d 843 (4th Cir. 1973)—reaches the merits of the claim. Cf. Ackerly v. Ley, 137 U.S.App.D.C. 133, 420 F.2d 1336 (1969); Tuchinsky v. Selective Serv. Sys., 418 F.2d 155 (7th Cir. 1969).

panding concern for the protection of privacy, cf. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), we refuse to hold that appellees must now, without any prior inspection by a court, turn over the summaries to appellants with only the proper names removed. Such a procedure—posing, as it does, grave risks to the reputations of affected cadets—might "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

In order to keep faith with the Act's overall mandate, however, we equally decline to hold at this time that Exemption Six covers all, or any part of, the summaries in issue. Rather, we follow appellants' alternative suggestion and remand with instructions to the district court to conduct an in camera inspection of the Honor and Ethics Code case histories, which it has never examined. Hawkes v. Internal Revenue Service, 467 F.2d 787 (6th Cir. 1972); Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971); Bristol-Myers Co. v. FTC, 138 U.S.App.D.C. 22, 424 F.2d 935, cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L. Ed.2d 52 (1970). Under 5 U.S.C. § 552(a)(3), see note 9 supra, the "burden" was on the Agency "to sustain its action" in failing to make the case summaries available. Having failed to carry that burden of justification under Exemption Six in the trial court by means of affidavits or testimony, the Agency must now produce the summaries themselves in court, Environmental Protection Agency v. Mink, 410 U.S. 73, 93, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), and cooperate with the judge in redacting the records so as to delete personal ref-

erences and all other identifying information. Cf. 5 U.S.C. § 552(a)(2).[17] The practice of furnishing abstracts of cases, while preserving anonymity, is not unknown to the law.[18] We think it highly likely that the combined skills of court and Agency, applied to the summaries,[19] will yield edited documents sufficient for the purpose sought and sufficient as well to safeguard affected persons in their legitimate claims of privacy.[20]

We cannot close this section of the opinion without one further comment. We have read out brother Moore's dissent with a sense of wonderment, since it states that we place our "stamp of approval upon" an "egregious invasion of constitutional rights of privacy." We, of course, do no such thing. We have refused to hold, in the second paragraph before this one, that the Agency is required, without any prior inspection by a court, to turn over the summaries to appellants with only the proper names removed. In addition, we have stated immediately above that personal references and all other identifying information should be deleted from the case summaries. If, in the opinion of the district judge, this is not sufficient to safeguard privacy, then the summaries should not be disclosed to appellants. Obviously, the problem would be a simple one if the Freedom of Information Act did not exist or if the only interest to be considered were that of the cadets. But construing Exemption Six is a much more complex process than is indicated by the dissent which fails to refer to the legislative history of the Act, the policy behind it or the cases construing it. In

---

17. This section, which requires, inter alia, publication of final opinions, statements of policy and administrative staff manuals, contemplates agency deletion of identifying details "[t]o the extent required to prevent a clearly unwarranted invasion of personal privacy. . . ."

18. See, e. g., Revenue Rulings collected in Cum.Bull. of the IRS; ABA, Opinions on Professional Ethics (1967).

19. It was estimated at oral argument that there were 100–200 summaries.

20. Cf. House Rep. 11, 1966 U.S.Code Cong. & Admin.News, p. 2428:

The exemption [six] is . . . intended to cover detailed Government records on an individual which can be identified as applying to that individual and not the facts concerning the award of a pension or benefit or the compilation of *unidentified statistical information from personal records.* [Emphasis added.]

any event, we believe that the in camera procedure required here will further the statutory goal of Exemption Six: a workable compromise between individual rights "and the preservation of public rights to Government information." House Rep. 11, 1966 U.S.Code Cong. & Admin.News p. 2428.[21]

## IV

As a final point, the Agency contends that the courts have a broad equitable power to decline to order release when disclosure would damage the public interest, and urges that we exercise this jurisdiction to withhold the summaries completely. Judge MacMahon rejected this argument, holding that Congress did not leave to the courts a general option of refusing to enforce the Act's requirement of disclosure even though no statutory exemption applies.

■■■ Much ink has been spilled on this issue, both by courts and commentators, and we are told that the legislative history is indeterminate[22] and that the appellate decisions are divided.[23] We are not sure how real the conflict is in most instances, since even the courts that are cited as opposing the notion of general equity power to refuse disclosure recognize that a truly exceptional case might require it. Tennessean Newspapers, Inc. v. Federal Housing Administration, 464 F.2d 657, 662 (6th Cir. 1972); Soucie v. David, 145 U.S.

App.D.C. 144, 448 F.2d 1067, 1077 (1971). It may be that the true controversy is over the definition of an exceptional case, since we are clear that generally the Act constrains the use of broad judicial discretion to *block* disclosure. Cf. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974) (dictum—broad equitable power to enforce the Act). In any event, in the context of Exemption Six the issue is not a substantial one, since the language of the exemption requires a court to exercise a large measure of discretion. This was pointed out by the Court of Appeals for the District of Columbia Circuit, a court frequently cited for the view that the federal courts have no general equitable jurisdiction to refuse disclosure when no exemption applies:

> "Any discretionary balancing of competing interests will necessarily be inconsistent with the purpose of the Act to give agencies, and courts as well, definitive guidelines in setting information policies. . . . But Exemption (6), by its explicit language, calls for such balancing and must therefore be viewed as an exception to the general thrust of the Act. S.Rep., at 9, explains:
>
> > "The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private af-

21. Moreover, despite the dissent's gloomy prediction, we do not envision a need for dozens of hours of hard labor by judicial and military officers. On the contrary, once agreement is reached on general principles of redaction, the actual process of editing the summaries should not take undue amounts of time.

22. Compare House Rep. 9 with Senate Rep. 3.

23. Thus, Duke Project 178–79 n. 9 states that the Fourth, Sixth and D.C. Circuits reject the idea of a general equitable jurisdiction and the Fifth and Ninth Circuits support it. Compare Robles v. Environmental Protection Agency, 484 F.2d 843, 847 (4th Cir. 1973); Tennessean Newspapers, Inc. v. Federal Housing Administration, 464 F.2d

657, 661–662 (6th Cir. 1972); Hawkes v. Internal Revenue Service, 467 F.2d 787, 792 n. 6 (6th Cir. 1972); Wellford v. Hardin, 444 F.2d 21, 24–25 (4th Cir. 1971); Getman v. NLRB, 146 U.S.App.D.C. 209, 450 F.2d 670, 677–680 (1971); Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1076–1077 (1971), with Wu v. National Endowment for Humanities, 460 F.2d 1030, 1034 (5th Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973); Benson v. General Serv. Administration, 415 F.2d 878 (9th Cir. 1969). But cf. Epstein v. Resor, 421 F.2d 930, 933 (9th Cir.), cert. denied, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970) (limited role of courts under the first and third exemptions). Prof. Davis also believes in the existence of equitable power to refuse disclosure. Davis 767.

fairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information. The application of this policy should lend itself particularly to those Government agencies where persons are required to submit vast amounts of personal data usually for limited purposes. * * * "

We note in passing that no other exemption specifically requires balancing. In view of the Act's basic purpose to limit discretion and encourage disclosure, we believe that Exemption (6) should be treated as unique, and that equitable discretion should not be imported into any of the other exemptions. . . .

Getman v. NLRB, 146 U.S.App.D.C. 209, 450 F.2d 670, 674 n. 10 (1971).

We have already decided that disclosure of the case summaries would not be "a clearly unwarranted invasion of personal privacy" under Exemption Six, if the summaries are redacted as set forth above. We agree with the court in *Getman* that no further balancing is necessary.[24]

Accordingly, we reverse and remand for further proceedings, consistent with this opinion and expedited pursuant to the command of 5 U.S.C. § 552(a)(3).

MOORE, Circuit Judge (dissenting):

I must express a most vigorous dissent to the majority's judicial stamp of approval upon the egregious invasion of constitutional rights of privacy which their opinion authorizes. At a time when the courts are more and more being called upon to protect an individual's character from being unnecessarily besmirched, when much is being said and written about prison rehabilitation, I am amazed that any court should countenance—much less authorize—the curiosity satisfying efforts of three law school students who, merely to write a Law Review note, would pry into and seek to disclose the former transgressions of Air Force cadets. This is not a case in which the courts can attempt to justify their interposition on the theory that Congress has failed to act and that, therefore, the courts must legislate. Here there is a definite statute of prohibition which the majority now overrides.

When an Air Force cadet is accused of lying, stealing or cheating at the Academy, he is protected by the greatest possible confidentiality. This may arise in part from the fact that this charge has been made possible by the principle of toleration which in grammar schoolyard parlance means "tattletale" or as phrased in the record as "The backbone of the Honor Code is the toleration clause which requires that every cadet report any suspected violation of the Code" (App. 120). Thus, not only must the cadet be protected but also the non-tolerator (tattler).

The hearings, as would be expected, are as sacrosanct as are (or should be) jury room proceedings, namely, "all matters discussed at the hearing are confidential and should not be discussed outside the room with anyone other than an Honor Representative" (App. 164–65). The summaries of each case are kept confidentially restricted except in a small area.

In passing the Freedom of Information Act, 5 U.S.C. § 552, Congress carefully and specifically excluded from public gaze:

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy

. . . .

If doctor-patient files are protected, how much the more should files dealing with quasi-criminal or possible charac-

---

**24.** While this case was under advisement, we asked the parties to brief the question of mootness, in view of the possibility that publication of plaintiffs' article would moot the issue. In their response, both sides af-firmed their belief that the matter of disclosure of the case summaries was still properly before us. We agreed with this conclusion and therefore proceeded to consider the case on the merits.

ter-besmirching facts to be kept secret. The disclosure of disease, be it venereal or mental, can be remedied or cured. The drawing of a bar sinister across the escutcheon of a young man entering upon his life's career, cannot be erased.

The Air Force officials, mindful of their duty to protect their cadets, responded in a manner which should have received the highest judicial commendation instead of disapproval. The Academy's Honor and Ethics Executive, in rejecting plaintiffs' request for the case summaries, stated:

> I regret that Academy policy requires denial of public access to honor case files, including selected ones in the Honor Code Reading Files. All of these cases are documented as 'For Official Use Only' and are disseminated for internal use only to the Honor Representatives and those few staff personnel who have a continuing need to understand the workings of the Cadet Honor Code. It would be in poor faith with all cadets who have met honor hearings to allow their cases to come into the public eye. To permit the use of honor cases for such purpose would tend to set a precedent that may operate to the detriment of innocent persons.

> To be accused or found guilty of an honor violation is an emotionally trying experience that should, in due respect for the rights of the individual concerned, be as limited as possible. Society in general does not understand the difference in the lying, cheating and stealing that constitutes a Cadet Honor violation as opposed to the degree of criminality required in society at large to cause an equally serious type of censor [sic: censure]. The problems of such misunderstanding and the unnecessary embarrassment that could result seems to exceed the value to be gained from making the case files available to the public.

In denying the request, the Commandant of Cadets stated (App. 30):

The Air Force Academy will be unable to provide you sample ethics cases. The sample ethics cases used in the Honor Code Reading File are designated 'For Official Use Only'. It is intended that these cases will be used for the edification of the Cadet Wing and Academy staff only. Indiscriminate release of this information to persons without a need to know could be counter to the best interest of the individuals concerned and the Air Force Academy.

When the request reached the Office of the Secretary of the Air Force, the futility of any attempted deletion was pointed out in the statement (App. 35):

> A release of the honor hearing cases and ethics cases would constitute an unwarranted invasion into the privacy of former cadets of the Academy. Some cases may be recognized by the reader by the circumstances alone without the identity of the cadet given. This being the case then the reader could easily connect the incident with the particular cadet involved. Additionally, they are internal documents which are not meant for mass circulation. They are stamped 'For Official Use Only' and are afforded subscribed routing and handling procedures.

The reasons for confidentiality and non-disclosure cannot be better summarized than by the Commandant's Executive for Honor and Ethics, who stated:

> There is no way of determining just how these facts will or could be used. This data could find its way to the relatives, friends and classmates of cadets and supply the missing link in disclosing the identity of a guilty cadet. No person who has made a mistake and been punished should have to have this mistake follow him for the rest of his life.

And, indeed, merely to satisfy the desire of plaintiffs to write a Law Review note, no court should aid and abet a project which could result in having a

cadet's "mistake follow him for the rest of his life." (App. 211a).

Deletion of names suggested by the majority would be of no avail. In addition to names, identifiable facts would have to be eliminated. Eliminating all determinative essentials would only create a hypothetical situation.

As the Commandant of Cadets so logically explained:

> The use of these case files or write-ups, even if the identity of the individual were not given, could still be an invasion of privacy as the incident may have been so notorious that the reader would immediately recognize the cadet who was the subject of the Honor or Ethics Hearing. In certain instances, the Cadet Wing has given the Honor Committee the prerogative to grant discretion to a cadet who has been voted guilty and to allow him to return to the Cadet Wing. The man who has learned his life-long lesson of honor can be a great asset to the Wing and to the Air Force. His retention is therefore not only justified; it is desired. . . . Therefore, every effort is made to avoid disclosure of the cadet's name so that he may return to the Wing unblemished to continue his education.

The majority recognize that their decision even with anonymous disclosure "could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends." These accused cadets are the real parties in interest; yet, as the majority concedes, "none of the parties to this lawsuit is committed first and foremost to the interests of affected cadets." Even the unborn child is in many situations entitled to his (or her) guardian *ad litem* and *Gideon* [1] was deemed to be entitled to be heard through counsel. But accused cadets are to be subjected to possible lifelong disgrace or loss of employment without any spokesman.

Of course, Congress never intended any such result. Nor does the Act so decree. Lest any implication to this effect might be gleaned therefrom, Congress wrote therein a specific prohibition against an "unwarranted invasion of personal privacy."

Consider briefly the majority's suggested protection against "this potential for serious harm". First, the Air Force must remove from all case summaries, estimated in open court as involving one hundred to two hundred summaries, all proper names. Then these nameless but not factless summaries are to be turned over to the District Court. There the majority are sure that "the combined skills of court and Agency, * * * will yield edited documents * * * sufficient * * * to safeguard affected persons in their legitimate claims of privacy." But for what purpose and at what cost? The purpose is clear, i. e., to have the Air Force and the District Court co-author a student contribution to a legal periodical. Time cost is another matter. Assuming only one hundred and fifty summaries, vital name excision should be capable of accomplishment in ten minutes per summary—an inconsequential twenty-five hours. However, careful Court editing to eliminate identifying facts would be much more time-consuming. Seventy-five hours of Court time would be conservative. In these days when there is so much clamor about the desirability of speedy trials, I am unwilling to subscribe to, or acquiesce in, any opinion which saddles such a needless burden upon an important branch of our military forces and, in my opinion, an equally important judicial branch. Hence, I dissent.

---

1. Gideon v. Wainwright, 372 U.S. 325, 83 S.Ct. 792, 9 L.Ed.2d 799 (1933).